## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 20 2016, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George Peter Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Bernie C. Harmon,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 20, 2016

Court of Appeals Case No.
13A01-1509-CR-1513

Appeal from the Crawford Circuit Court

The Honorable Kenneth Lynn Lopp, Judge.

Trial Court Cause No.
13C01-1307-FB-27

**Mathias, Judge.**

[1] Bernie Harmon ("Harmon") was convicted in Crawford Circuit Court of two counts of Class B felony sexual misconduct with a minor, two counts of Class C

felony sexual misconduct with a minor, Class C felony child molesting, two counts of Class B felony vicarious sexual gratification, Class C felony vicarious sexual gratification, four counts of Class D felony neglect of a dependent, Class C felony battery, two counts of Class D felony battery, and Class A misdemeanor battery. The trial court ordered Harmon to serve an aggregate term of eighty years at the Department of Correction with thirteen years suspended to probation. Harmon appeals and presents four issues, which we renumber and restate as:

    I.   Whether the State presented sufficient evidence to support Harmon's Count III, Class C felony child molesting and Count XIII, Class C felony battery convictions;

    II.  Whether the trial court abused its discretion in excluding evidence that another person perpetrated the sexual misconduct with a minor offense in violation of Harmon's right to present a defense as provided in the U.S. Constitution and Indiana Constitution;

    III. Whether Harmon's neglect of a dependent and battery convictions violate Indiana's prohibition against double jeopardy; and,

    IV. Whether the trial court imposed an erroneous sentence.

[2]    We affirm.

## Facts and Procedural History

[3]    Harmon and his wife, Melissa Harmon ("Melissa") (collectively "the Harmons") lived in Crawford County, Indiana with their biological son, K.H.,. and biological daughter, W.H. The Harmons drove school buses and operated a

car repair shop near their home. In 2005, the Harmons became foster parents to five children[1] ("the Children"). C.H.[2], S.H.[3], and C.A.H.,[4] who were biological siblings, and G.H.[5] and M.H.,[6] who were biological siblings. In April 2006, the Children were removed for a short period and returned to the Harmons in 2007, after they received more foster parent training. In March 2008, the Harmons adopted C.H., S.H., and C.A.H. Several months later in June, the Harmons adopted G.H. and M.H.

[4] Shortly after adoption, the Children were treated significantly worse than when they were foster children. Harmon began physically and sexually abusing the Children and limiting the amount of food that they could eat. According to the Children, Harmon punished them by hitting their buttocks or backsides with a paddle, an extension cord, a switch[7], a bull whip or a horsewhip. The Children were sometimes clothed when Harmon beat them, but other times they were not. S.H. indicated that Harmon beat her many times, and she also saw Harmon beat the other children. C.A.H. explained that Harmon sometimes

---

[1] C.H. is not included in this designation based on the events pertinent to this appeal.

[2] C.H. left the Harmon household when he was eighteen years old after running away on several prior occasions. None of Harmon's convictions involve C.H., but Harmon attempted to introduce testimony that C.H. was the perpetrator of the sexual abuse instead of him.

[3] A girl born in 1997.

[4] A girl born in 1998.

[5] A boy born in 2000.

[6] A boy born in 2001.

[7] Harmon described a switch as a small branch from a tree or bush.

whipped her a couple times a day, but not every day. Harmon told C.A.H. while she was still a foster child that she would be the first to be "whipped" after the Children were adopted. Tr. p. 322. Harmon also hit C.A.H. in the head with an ax handle, which caused bumps. M.H. and G.H. were whipped a couple of times per week.

[5] Several of the children reported that Harmon sexually abused them after they were adopted.[8] Harmon touched S.H.'s breasts on numerous occasions and sometimes masturbated while he touched her.[9] Harmon also had sexual intercourse with S.H. and forced her to perform oral sex on him about four or five times. Harmon touched C.A.H.'s breasts and vagina as well. Harmon made

---

[8] The Children reported that these acts occurred mostly in Harmon's shop and in a garage near the house, but also in a bathroom in the house, and in the attic.

[9] S.H. was asked when Harmon first touched her breast:

Q:     And do you remember the first time you knew it was him?

A:     Yes.

Q:     Okay and when and where did that take place?

A:     It was, um, in the summer time, school was about to end, um, and I was taken out of school. It was, um, in his shop, a little room.

Q:     Okay in his shop and it was in summer time?

A:     Yes.

Q:     And now you said you were taken out of school in fifth grade, right?

A:     Yes.

Q:     So would this be right after fifth grade?

A:     It'd be, I think towards the end of sixth grade year that I didn't go to school.

Q:     It was during sixth grade year, you think?

A:     Yes.

Tr. pp. 231-32.

C.A.H. perform oral sex on him and ejaculated in her mouth. He also placed hot dogs in C.A.H.'s vagina.

[6]     Further, Harmon instructed G.H. to perform and receive sexual acts on and from S.H. and C.A.H. Harmon made C.A.H. perform oral sex on G.H. and in return G.H. sucked on C.A.H.'s breasts. Harmon also told S.H. and G.H. to perform oral sex on one another. On another occasion when Harmon was driving home from his shop, he instructed G.H. to perform oral sex on S.H. as he drove. Harmon told the Children if they did not comply that he would beat them.

[7]     The Children reported being hungry as well. They were not allowed to access the refrigerator at home. During the 2009-2010 school year, G.H. and M.H. asked other children for food and rummaged through the trash looking for uneaten snacks. One of the girls also stole peanut butter from her classroom and kept it in her locker to eat.[10] The Children were removed from public school after completing the 2009-2010 school year. Harmon stated that he was tired of receiving calls about the Children from school officials and the DCS investigations. At the time, M.H. had just completed second grade, G.H. had completed third grade, C.A.H. had completed sixth grade, and S.H. had completed fifth grade.[11] Several of the children stated that they completed

---

[10] The testimony is conflicting regarding whether S.H. or C.A.H. stole the peanut butter.

[11] The record reflects that S.H. had difficulty in school and was held back at least one grade.

homeschooling workbooks for about one year at the Harmon household but then the lessons stopped completely.

[8] The Children also slept in the attic, which could be accessed with a step ladder.[12] During the night, the Harmons locked the door to the attic and removed the step ladder so the Children could not access the downstairs bathroom. As a result, the Children urinated and defecated in the attic insulation and in plastic bottles and bags. The oldest child, C.H., stayed in the Harmon's shed. The shed had electricity, a mini refrigerator, and a couch, but no bathroom. The Children were instructed to urinate and defecate in the woods in a bucket, but they were allowed to bathe in the house.

[9] At one point after the Children were adopted, the Harmons went on vacation to Tennessee for about a week and left the Children at home with their older daughter, W.H. However, during this time, the Children were not allowed to go in the house, so they slept in the Harmon's camper and urinated and defecated as needed in the woods.

[10] Harmon and Melissa explained that the Children had a habit of digging through dumpsters and leaving trash in the woods. In March 2013, Harmon told the Children that they needed to clean up the trash in the woods.[13] If they failed to

---

[12] The house was being renovated during the time relevant to these events. At one point there was also a wall ladder.

[13] The Children stated that Harmon wanted them to clean up the area in the woods where they used the bathroom.

comply, he told them that they would be beaten. On March 19, 2013, G.H. and M.H. ran away from home because they were tired of "getting whipped." Tr. p. 364. At this time, G.H. also told M.H. about his forced sexual interactions with S.H. and C.A.H. One of Harmon's neighbors found the boys walking on his property and transported them to the courthouse. G.H. told authorities about the physical and sexual abuse that he and the other children had experienced from Harmon. G.H. also wrote a letter to the judge asking not to be sent back to the Harmon's home.

[11] The Harmons were notified that the boys were found and were asked to bring S.H. and C.A.H. to the courthouse as well. They complied, and the girls were questioned. At first, S.H. and C.A.H. denied the accusations and indicated that they wanted to return home with the Harmons. However, C.A.H. later explained that she denied the accusations because she was afraid, and S.H. stated that she thought she would be placed in a worse foster home. Detective Craig Starr ("Detective Starr") observed multiple red lateral marks on M.H.'s right and left buttocks along with several bruises on the back of his left thigh. Detective Starr also noticed that G.H. had a lateral mark on his right butt cheek and several lateral marks on his left buttocks and his lower hip area. The Children were then examined by a nurse at Memorial Hospital. The nurse documented that S.H. had scars and bruises on her hand, and C.A.H. had

numerous marks, bruises, and scars.[14] State's Ex. Vol., Ex. 12-13. She also noted that all of the Children except for G.H. were very emaciated. Tr. p. 421.

[12] The Harmons gave up their parental rights to the Children on May 21, 2013. S.H. and C.A.H. were placed in a foster home, and G.H. and M.H. were placed in a different foster home. The Children were then placed back in public school after three years of being homeschooled. The record reflects that the Children actually completed lessons for one year at most but were unable to pass their grade-appropriate placement tests.

[13] Harmon denied any allegations of sexual abuse but admitted to disciplining the Children with a paddle and a switch. He also denied ever using a whip of any kind as a means of discipline. Harmon explained that the Children would frequently misbehave and he thought that this type of discipline would be more effective than the time outs that he used when they were foster children.

[14] On July 26, 2013, a grand jury indicted Harmon for multiple offenses, including child molesting, neglect of a dependent, battery, vicarious sexual gratification, and sexual misconduct with a minor. On April 20, 2015, the State filed an amended indictment which included: Count I, Class B felony sexual misconduct with a minor, Count II, Class C felony sexual misconduct with a minor, Count III, Class C felony child molesting, Count IV, Class B felony

---

[14] All of the Children's injuries were photographed after they were removed from the Harmon's care, and those photos were admitted as evidence at trial.

sexual misconduct with a minor, Count V, Class C felony sexual misconduct with a minor, Count VI, Class B felony vicarious sexual gratification, Count VII, Class C felony vicarious sexual gratification, Count VIII, Class B felony vicarious sexual gratification, Counts IX-XII, Class D felony neglect of a dependent, Count XIII, Class C felony battery, Counts XIV-XV, Class D felony battery, and Count XVI, Class A misdemeanor battery.

[15] A jury trial was held on June 9-17, 2015. The jury returned a verdict of guilty on all counts. The trial court held a sentencing hearing on August 25, 2015, and ordered Harmon to serve twelve years with two years suspended on Count I; six years with one year suspended on Count II; six years with one year suspended on Count III; twelve years with two years suspended on Count IV; six years with one year suspended on Count V; twelve years with two years suspended on Counts VI; six years with one year suspended on Count VII; twelve years with two years suspended on Count VIII; two years executed each on Counts IX-XII; five years with one year suspended on Count XIII; two years with six months suspended each on Counts XIV and XV; and one year executed on Count XVI. The court ordered Counts I-VIII to run consecutively and Counts IX-XII to run concurrently but consecutively to all other counts. Further, the court ordered Counts XIII through XV to run concurrently but consecutively to all other counts and Count XVI to run consecutively to all other counts, for an aggregate sentence of eighty years executed at the Department of Correction, thirteen of which were suspended to probation.

At sentencing, the trial court found as mitigating factors that incarceration would be a hardship on Harmon's family, Harmon showed a modest amount of remorse for the battery convictions, and Harmon had no prior criminal history. The court determined several aggravating factors including:

(1) Harmon was in a position of trust as a parent, and the children looked to him for guidance and, Harmon violated their trust. While he should have been their protector, he became their predator;

(2) the children looked to Harmon for stability, care, and love but found quite the opposite;

(3) Harmon's lack of remorse on the remaining convictions; and

(4) the number of strikes against one of the Children exceeded the number needed to prove a felony, the type of weapon used to punish that child, along with the severity of that injury.

Harmon now appeals.

## I. Sufficiency of the Evidence

Harmon argues that the Count III, Class C felony child molesting and Count XIII, Class C felony battery convictions were not supported by sufficient evidence. "Upon a challenge to the sufficiency of evidence to support a conviction, a reviewing court does not reweigh the evidence or judge the credibility of witnesses, and respects the jury's exclusive province to weigh conflicting evidence. *Montgomery v. State*, 878 N.E.2d 262, 265 (Ind. Ct. App. 2007) (quoting *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005)). We consider only probative evidence and reasonable inferences supporting the verdict. *Id.* We must affirm if the probative evidence and reasonable inferences drawn from

the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

*A. Class C Felony Child Molesting*

[18] Specifically, Harmon argues that S.H. was not under fourteen years of age when he fondled her. The State was required to prove beyond a reasonable doubt that Harmon:

> with a child under fourteen (14) years of age, touched the breasts of S.H. with the intent to arouse himself.

Appellant's Amended App. p. 251; *see also* Ind. Code § 35-42-4-3(b).

[19] Harmon argues that based on S.H.'s testimony, Harmon first touched her breast when she was in sixth grade, so S.H. would have been fourteen at that time.[15] However, both S.H. and a school official testified that S.H. was taken out of school after the 2009-2010 school year after completing fifth grade. S.H. testified that the fondling occurred "in the summer time, school was about to end and [she] was taken out of school." Tr. p. 231. Although S.H. thought she was in sixth grade when Harmon first touched her, based on her other testimony, the jury could have reasonably concluded that the fondling happened in the summer of 2010 when S.H. was thirteen years old. We must respect this discretion. *See McHenry,* 820 N.E.2d at 126. Therefore, we conclude

---

[15] S.H. was born in April 1997.

that the State presented sufficient evidence to support Harmon's conviction for Count III, Class C felony child molesting.

*B. Class C Felony Battery*

[20] Although Harmon concedes that C.A.H. experienced pain from his punishment, he argues that it does not constitute extreme pain as required to elevate the conviction to Class C felony battery. The State was required to prove beyond a reasonable doubt that Harmon:

> knowingly or intentionally touched C.A.H. in a rude, insolent, or angry manner, resulting in serious bodily injury thereto.

Appellant's Amended App. p. 256; *see also* Ind. Code § 35-42-2-1(3).

[21] "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes: serious permanent disfigurement, unconsciousness, extreme pain, permanent or protracted loss or impairment of the function of a bodily member or organ, or loss of a fetus. Ind. Code § 35-31.5-2-292. There is no bright line rule differentiating "bodily injury" from "serious bodily injury." *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004). Whether bodily injury is "serious" is a question of degree and therefore appropriately reserved for the finder of fact. *Whitlow v. State*, 901 N.E.2d 659, 661 (Ind. Ct. App. 2009).

[22] At trial, C.A.H. testified that Harmon used a horsewhip to whip her a couple of times per day. She indicated that she was whipped on her back, buttocks, and legs. At the time C.A.H. was removed from the Harmon household and

examined, photographs were taken depicting red marks, bruises, and scars. *See* State's Ex. Vol., Ex. 12-13. Our supreme court held in *Norris v. State* that photographs taken of a victim after receiving treatment for injuries depicting numerous cuts and bruises were sufficient to show that the victim suffered "serious bodily injury" as required to support defendant's Class C felony battery conviction. 419 N.E.2d 129, 132 (Ind. 1981).

[23] Also, our court held in *Buckner v. State* that the evidence was sufficient to support serious bodily injury and a conviction for Class C felony battery when the victim testified that defendant punched her several times with his fists and those punches left a number of bruises and scratches on the victim's face and other parts of her body. 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006).

[24] Harmon relies on our supreme court's holding in *Davis v. State* for the proposition that a victim's injuries including a lacerated hip, knee abrasion, and a broken pinky finger without testimony describing the victim's level of pain did not rise to the level of serious bodily injury or extreme pain. 813 N.E.2d 1176, 1178 (Ind. 2004). However, *Davis* involved a domestic violence situation between an adult boyfriend and girlfriend. *Id.* at 1177. Our supreme court emphasized that although the victim sought treatment, she was not prescribed pain medicine at the hospital, an officer saw her walking normally at the crime scene, and she said little about her pain at trial. *Id.* at 1178.

[25] Like the victim in *Davis*, C.A.H. did not testify about the level of pain she experienced when Harmon whipped her. However, C.A.H. was a minor child

under the care of the Harmons and did not have the ability to seek medical treatment on her own. Rather, she would have required the assistance of Harmon, who was the person who caused her injuries. *See Whitlow*, 901 N.E.2d at 661. We find C.A.H. to be more akin to the victim in *Norris*, whose injury photographs were sufficient to prove serious bodily injury and the victim in *Buckner*, whose testimony of being repeatedly struck with a belt that left marks on her body was sufficient to prove serious bodily injury. For all of these reasons, we conclude that based on C.A.H.'s testimony and post-examination photographs, the jury could reasonably conclude that C.A.H. experienced extreme pain when Harmon whipped her with a horsewhip.

## II. Trial Court's Exclusion of Evidence

[26]     Harmon also argues that trial court abused its discretion in excluding evidence that another person perpetrated the sexual misconduct with a minor offense in violation of Harmon's right to present a defense as provided in the U.S. Constitution and Indiana Constitution. As a general matter, the decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal. *Carpenter v. State,* 786 N.E.2d 696, 702 (Ind. 2003). We will not reverse the trial court's decision unless it represents a manifest abuse of discretion that results in the denial of a fair trial. *Id.* An abuse of discretion in this context occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.* at 703. Even if the trial court's decision was an abuse

of discretion, we will not reverse if the admission of evidence constituted harmless error. *Micheau v. State*, 893 N.E.2d 1053, 1059 (Ind. Ct. App. 2008).

[27] Harmon specifically argues that the trial court erred in excluding the testimony of subsequent foster parent Deborah Wills ("Wills")[16] that: (1) C.H. had sex with S.H., and (2) that Wills overheard S.H. tell C.A.H., "You know dad never touched you."[17] Tr. p. 1047.

*A. Wills's First Statement*

[28] Harmon contends that Wills's first statement should have been admitted under Rule 412 (b)(1)(A). The admission of evidence relating to a victim's past sexual conduct is governed by Indiana Evidence Rule 412.[18] Rule 412 provides that, with very few exceptions in a prosecution for a sex crime, evidence of the past sexual conduct of a victim or witness may not be admitted into evidence. Rule 412(b)(1) outlines several exceptions to the general prohibition in a criminal case including:

> (A) evidence of specific instances of a victim's or witness's sexual behavior, if offered to prove that someone other than the

---

[16] Wills was S.H. and C.A.H.'s foster parent after the girls were removed from the Harmon household.

[17] Harmon did not separately analyze the two statements included in Wills's testimony. This caused overlap and confusion in understanding Harmon's argument because one statement relates to behavior between S.H. and C.H. and the other statement involves C.A.H. and Harmon. We have separated the statements for purposes of clarity.

[18] Harmon also cites to Indiana Code section 35-37-4-4, the rape shield act. However, this act has been superseded by Evidence Rule 412. *See Sallee v. State*, 785 N.E.2d 645, 650 (Ind. Ct. App. 2003).

defendant was the source of semen, injury, or other physical evidence;

(B) evidence of specific instances of a victim's or witness's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

(C) evidence whose exclusion would violate the defendant's constitutional rights.

[29] Harmon claims that Wills was prepared to testify, as she did in her deposition, that "[S.H.] said that they had lots of fights, her brother [C.H.] would beat her and have sex with her[.]" Tr. p. 1046. However, Wills's statement does not establish that Harmon did not have sex with S.H, only that C.H. may have had sex with S.H., too. Therefore, the statement does not assist Harmon with his defense and is evidence of S.H.'s past sexual conduct, which is prohibited by Evidence Rule 412(1)(a).

[30] Further, Wills's first statement does not fall under the Evidence Rule 412(b)(1)(A) exception that focuses on physical evidence.[19] Here, the State did not present physical evidence claiming that Harmon sexually abused the Children. Instead, the State relied on the testimony of S.H., C.A.H., and G.H. that Harmon sexually abused them. *See Pribie v. State*, 46 N.E.3d 1241, 1248 (Ind. Ct. App. 2015) (stating "[a]n exception that allows a defendant to rebut

---

[19] The purpose of this exception is for defendant to rebut the State's evidence by claiming that someone else was the source of the physical evidence. *See Pribie v. State*, 46 N.E.3d 1241, 1248 (Ind. Ct. App. 2015) (stating "[t]he rule contemplates if the State had presented the [physical evidence] to the jury, defendant then would have been allowed to present evidence that the [physical evidence] came from someone else.").

physical evidence presupposes that evidence; since the State did not rely on physical evidence to convict defendant, the exception does not apply."). Therefore, evidence that one of the victims may have engaged in sexual activity with another family member is not admissible under this exception.

*B. Wills's Second Statement*

[31] Harmon also argues that even if our court determines that the Rule 412(b)(1)(A) exception does not apply to Wills's first statement, Wills's second statement that she overhead S.H. tell C.A.H., "You know dad never touched you," is admissible under Indiana Evidence Rule 613(b) which states in relevant part:

> Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision does not apply to an opposing party's statement under 801(d)(2).

[32] Although Harmon did not address it in his argument, Wills's second statement is classic hearsay. Indiana Evidence Rule 801(c) provides:

> "Hearsay" means a statement that: (1) is not made by the declarant while testifying at trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted.

As such, even if we concluded that Wills's second statement was admissible under 613(b) to impeach S.H.'s credibility, the substance of the statement could not aid in Harmon's defense to prove that he did not

touch C.A.H. Even so, Wills's proffered testimony was not that C.H. touched C.A.H. instead of Harmon.

[33] Harmon also asserts that by excluding Wills's testimony, the trial court violated his right to present a defense under both the U.S. Constitution and the Indiana Constitution. Harmon claims that he raised the "right to defense" argument at the pretrial hearing when the trial court was considering the State's motion in limine. However, "[r]ulings on motions in limine are not final decisions and, therefore, do not preserve error for appeal." *Swaynie v. State*, 762 N.E.2d 112, 113 (Ind. 2002). Harmon failed to preserve this issue for appeal because he did not raise the argument again at trial.

[34] Harmon alternatively argues that the exclusion of Wills's testimony violated his right to present a defense, and as such constitutes fundamental error. A fundamental error is one that constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). The error must be so prejudicial to the rights of the defendant so as to make a fair trial impossible. *Taylor v. State*, 717 N.E.2d 90, 93 (Ind. 1999).

[35] Although the right to present a defense is of utmost importance, it is not absolute. *Marley v. State*, 747 N.E.2d 1123, 1132 (Ind. 2001)." [T]he accused, as is required of the State, must comply with the established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *Id.* The Constitution "prohibits the

exclusion of defense evidence that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," but trial judges may exclude evidence "if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Ruiz v. State*, 926 N.E.2d 532, 534 (Ind. Ct. App. 2010) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)). Further, the trial court has wide discretion in determining the scope of cross-examination and only an abuse of discretion warrants that reversal. *Seketa v. State*, 817 N.E.2d 690, 693 (Ind. Ct. App. 2004).

[36] Wills's first statement that Harmon sought to introduce did not implicate C.H. instead of Harmon in molesting S.H., but rather indicated that S.H. also had sex at some point with C.H. *See Pribie*, 46 N.E.3d at 1248 (concluding that the trial court did not violate defendant's right to present a defense when it excluded evidence that a victim engaged in prior sexual activity). Thus, it was irrelevant and had great potential to mislead the jury.

[37] Further, Harmon had the opportunity to extensively cross-examine S.H., C.A.H., and C.H. Both S.H. and C.H. denied engaging in sexual relations with one another. C.H. also denied engaging in sexual relations with C.A.H., but C.A.H. was not asked whether she ever had a sexual relationship with C.H. Therefore, we conclude that the trial court's exclusion of Wills's testimony did not violate Harmon's right to present a defense and accordingly did not constitute fundamental error.

[38] Furthermore, even if the trial court had erred in excluding Wills's testimony, any error was harmless. Where wrongfully excluded evidence is merely cumulative of other evidence presented, its exclusion is harmless error. *Pierce v. State*, 29 N.E.3d 1258, 1268 (Ind. 2015). Wills's testimony would have been cumulative to other evidence presented because the jury also heard testimony that the girls originally denied that Harmon molested them. We also acknowledge Harmon's argument that the State opened the door to this evidence. However, the State called C.H. to testify only after Harmon claimed in his opening statement that it was C.H. who sexually abused S.H. and C.A.H. instead of Harmon. Regardless, there is an overwhelming amount of evidence of Harmon's guilt, and any such error was harmless. For all of these reasons, we conclude that the trial court did not abuse its discretion in excluding Wills's testimony.

### III. Double Jeopardy

[39] Harmon contends that his four neglect of a dependent and four battery convictions violate Indiana's prohibition against double jeopardy. Specifically, he argues that because the State charged the neglect offense by listing several allegations of neglect in the disjunctive that there is a reasonable possibility that the jury could have convicted Harmon of neglect by using the same evidence of the whippings when it convicted him for battery.

[40] The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. Our supreme court has

developed a two-part test for Indiana double jeopardy claims, holding that two or more offenses are the "same offense" in violation of Article 1, Section 14, if, with respect to either the statutory elements or the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish elements of one offense may also have been used to establish the essential elements of a second challenged offense. *Id.* at 53.

[41] Our supreme court clarified the *Richardson* test in *Bald v. State*, holding that no violation of the actual evidence test occurs as long as "each conviction [contains] proof of at least one unique evidentiary fact." 766 N.E.2d 1170, 1172 (Ind. 2002). To determine if a jeopardy violation occurred, our court considers the charging information, jury instructions, and arguments of counsel. *Spivey v. State*, 761 N.E.2d 831, 832 (Ind. 2002).

[42] Here, the State charged Harmon with four counts of Class D felony neglect of a dependent. The charges stated in relevant part:

> [O]n or about and between the 1st day of January, 2009, and the 19th day of March, 2013, in the County of Crawford, State of Indiana, Bernie C. Harmon, a person having the care of a dependent, whether assumed voluntarily or because of a legal obligation did knowingly or intentionally place the dependent in a situation that endangered the dependent's life or health, and/or

cruelly confined the dependent, and/or deprived the dependent of education as required by law: to wit: [Harmon] having the care of [the victim] to a home environment wherein [he/she] was subjected to unreasonable corporal punishment, and/or was not provided adequate food/nutrition resulting in psychological and/or physical harm, and/or cruelly confined [him/her] in the attic of his home, and/or failed to enroll [him/her] in school or provide an education as required by law.

Appellant's Amended App. pp. 254-55. The State also charged Harmon with four counts of battery. The charging information provided in relevant part:

[O]n or about the 17th day of March in the County of Crawford, State of Indiana, Bernie C. Harmon, being a person of at least eighteen (18) years of age, did knowingly or intentionally touch [the victim], who was less than fourteen years of age, in a rude, insolent, or angry manner, resulting in bodily injury to wit: struck [the victim] several times with a whip causing [him/her] to suffer pain.[20]

Appellant's Amended App. pp. 256-57. Further, at closing the State noted:

[A]s I told you before, there's three different theories under the neglect. . . One places the dependent in a situation that endangers the dependent's life or health. Two abandons or cruelly confines

---

[20] Harmon was charged with and convicted of one count of Class C felony, two counts of Class D felony, and one count of Class A misdemeanor battery. Although there are differences in the charging information based on age of the victim and the level of pain the victim experienced, all battery charges stem from the Children being "struck several times with a whip."

the dependent. And three deprives the dependent of an education as required by law. And a simple explanation to this is that there are four different counts of neglect. One for each child. And in order for you to find him guilty of neglect, you just have to determine that he's committed neglect in at least one of these three ways. Placed the dependent in a situation that endangered his or her health by unreasonable corporal punishment or inadequate food. That's one. Two, cruelly confined the dependent in an attic or three deprived the dependent of education and there's a reason why I highlighted deprived the dependent of an education because all you have to do, you probably heard this, you have to unanimously decide something beyond a reasonable doubt. Theoretically the twelve of you who ended up being jurors, it's possible that five of you could decide that he's guilty of one, of the first one and not the other two and three of you could decide he's guilty of a different one. As long as each person feels he's guilty of at least one of the three and I, uh, I don't want to be presumptuous but it seems obvious that we've proven this count of neglect, which was number four, which is the third one down, deprived the dependent of an education. . .Cause assuming you believe beyond a reasonable doubt that he deprived these children of an education required by law, you don't even need to decide whether or not he cruelly confined them in the attic or he didn't feed them enough or he uh, used too much corporal punishment.

Tr. pp. 1203-04.

[43] Harmon relies on *Morgan v. State*, in which our supreme court held that a double jeopardy violation occurred where the charging information left open a mere possibility that the jury relied on the same acts to convict the defendant of two different offenses. 675 N.E.2d 1067, 1072 (Ind. 1996). However, our supreme court clarified its position several years later in *Redman v. State* in

stating, "[t]he issue before us, however, is not merely whether it is *possible* that this occurred, but rather whether the likelihood of this occurrence is sufficiently substantial for us to conclude that it is *reasonably possible* that this occurred." 743 N.E.2d 263, 267 (Ind. 2001).

In *Redman*, the defendant argued that there was a reasonable possibility that the jury used the evidence of the victim's abduction to establish both of the conspiracy to commit murder and the criminal confinement offenses. *Id.* The charging information identified four alternative overt acts, one of which was abduction. The defendant further argued that the language of the conspiracy charge permitted the victim's abduction to constitute the overt act element and that the State's voir dire, opening statement, witness testimony, and closing statement described the initial abduction evidence as the basis for the criminal confinement charge. *Id.*

The State argued in response that there was no reasonable possibility that the jury relied on the same evidentiary facts to prove both charges because the charged overt acts were supported by separate evidence. *Id.* Our supreme court agreed with the State and relied on its reasoning in *Griffin v. State*, 717 N.E.2d 73 (Ind. 1999), a situation where a jury was instructed that a charge of conspiracy to commit robbery could be established by various alleged overt acts, one of which was the completed robbery itself. In *Griffin*, our supreme court noted the extensive evidence of other alleged overt acts and rejected the claim of double jeopardy and emphasized: "[t]o establish that two offenses are

the same offense under the actual evidence test, the possibility must be reasonable, not speculative or remote." *Id.* at 89.

[46] In the present situation, like in *Redman* and *Griffin*, the charging information identified alternative overt acts that could constitute neglect of a dependent. One of the overt acts included unreasonable corporal punishment, which was also the basis for the battery offenses. Here, like in *Griffin*, we conclude that the State presented extensive evidence of Harmon's other alleged acts of neglect. The Children testified that they were confined to the attic, were deprived adequate food, and that they only were homeschooled for at most one year of the three years that they were taken out of public school. Further, the State emphasized at closing the three alternative theories of neglect, not limiting the overt act to unreasonable corporal punishment. Rather, the State indicated that it was "clear" and "obvious" that Harmon neglected the Children by failing to provide them with an education. Tr. pp. 1204-05. Therefore, we conclude that there is no reasonable possibility that the jury relied on the evidence of unreasonable corporal punishment to establish the neglect element of Harmon's neglect of a dependent charges. As a result, no double jeopardy violation occurred.

### IV. Harmon's Sentence

[47] Finally, Harmon argues that the trial court imposed an erroneous sentence in several respects.

*A. Abuse of Discretion*

[48]     Harmon first argues that the trial court considered improper aggravators at sentencing. As explained by our supreme court, "sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion." *Anglemeyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*. 875 N.E.2d 218 (Ind. 2007). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court may abuse its discretion by failing to issue a sentencing statement, or by issuing a sentencing statement that bases a sentence on reasons that are not supported by the record, that omits reasons both advanced for consideration and clearly supported by the record, or that includes reasons that are improper as a matter of law. *Id.* at 490-91. However, under the post-*Blakely* amendments to our sentencing statutes, a trial court can no longer be said to have abused its discretion by improperly weighing or balancing aggravating and mitigating circumstances. *Id.* at 491.

*1. Improper Aggravator No. 1*

[49]     Harmon claims that the court's finding that he struck C.A.H. with a whip in excess of evidence required to prove felony battery was not supported by the record. In other words, the trial court found this battery to be particularly severe in nature. The nature of the crime is "appropriately considered. . . as an aggravating circumstance." *Bailey v. State*, 763 N.E.2d 998, 1004 (Ind. 2002).

Thus, facts evidencing the particular brutality of an attack may be considered as an aggravating circumstance when sentencing a defendant for aggravated battery. *Id*; *see also Benton v. State*, 691 N.E.2d 459, 464 (Ind. Ct. App. 1998) (although bodily injury is an element of burglary, "the viciousness with which the injury was inflicted" could be considered as an aggravating circumstance to enhance the sentence).

[50]  Here, C.A.H. testified that Harmon whipped her as a routine punishment and the State submitted photographs of C.A.H.'s injuries consistent with being struck with a whip numerous times. Based on these facts and circumstances, we conclude that the trial court did not abuse its discretion in considering the severity of C.A.H.'s injuries as an aggravator.

*2. Improper Aggravator No. 2*

[51]  Harmon also challenges the court's finding that he lacked remorse as an aggravating factor. Although a court may not enhance a sentence for a defendant consistently maintaining his innocence if the defendant does so in good faith, a court may consider the defendant's lack of remorse. *Cox v. State*, 780 N.E.2d 1150, 1158 (Ind. Ct. App. 2002). "A lack of remorse is displayed by a defendant when he displays disdain or recalcitrance, the equivalent of 'I don't care.' This is distinguished from the right to maintain one's innocence, i.e., 'I didn't do it.'" *Id.*

[52]  Here, the trial court equated Harmon's continuing claim of innocence with a lack of remorse. Therefore, the trial court abused its discretion in determining

that lack of remorse was an aggravator. However, because the court found three other proper aggravators, this error is harmless. *See Garrett v. State*, 714 N.E.2d 618, 623 (Ind. 1999) (the trial court erred in finding one improper aggravating factor, but defendant's sentence was supported by other valid aggravators).

*3. Consecutive Sentences*

Harmon further argues that the trial court's imposition of consecutive sentences was inappropriate. However, Harmon should have addressed this under the abuse of discretion standard, not the inappropriate sentence standard. In order to impose consecutive sentences, the trial court must find at least one aggravating circumstance. *Rhoiney v. State*, 940 N.E.2d 841, 846 (Ind. Ct. App. 2010). Here, the trial court noted Harmon's position of trust and that the children came looking to him for stability, care, and love but found quite the opposite among other aggravating circumstances. The same aggravating circumstance may be used to both enhance a sentence and justify consecutive terms. *Id.* Therefore, we conclude that the trial court did not abuse its discretion in imposing consecutive sentences.

*B. Appropriateness of Sentence*

Under Indiana Appellate Rule 7(B):

> [We] may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.

When reviewing a sentence, our principal role is to "leaven the outliers" rather than necessarily achieve what is perceived as the "correct" result. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). Our review under Appellate Rule 7(B) should focus on "the forest"–the aggregate sentence–rather than the trees–consecutive or concurrent, number of counts, or length of the sentence on any individual count. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008).

[55] Sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference. *Id.* at 1222 (Ind. 2008) (citing *Morgan v. State*, 675 N.E.2d 1067, 1072 (Ind. 1996)). Therefore, the defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[56] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed in assessing the nature of the offense. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007). The "character of the offender" portion of the sentence involves consideration of the aggravating and mitigating circumstances and general considerations. *Clara v. State*, 899 N.E.2d 733, 735 (Ind. Ct. App. 2009).

[57] Harmon was convicted of four counts of Class B felony, five counts of Class C felony, six counts of Class D felony, and one count of Class A misdemeanor. During the time of Harmon's offenses, the sentencing range for a Class B felony was six to twenty years, with ten years being the advisory sentence. *See* Ind. Code § 35-50-2-5. The sentencing range for a Class C felony was two to eight years, with four years being the advisory sentence. *See* Ind. Code § 35-50-2-6. The sentencing range for Class D felony was six months to three years, with one and one half years being the advisory sentence. *See* Ind. Code § 35-50-2-7. The sentence for Class A misdemeanor was one year. *See* Ind. Code § 35-50-3-2. Thus, the statutory maximum for Harmon would have been one hundred and forty-seven years. The trial court ordered Harmon to serve an aggregate eighty-year sentence, with thirteen years suspended.

[58] Concerning the nature of the offenses, we observe that Harmon's behaviors were absolutely reprehensible. The Children came to the Harmon family as foster children looking for stability and care. After being adopted and thinking that they found their forever family, the Children were physically and sexually abused and were neither properly fed nor educated. The Children were often times not allowed in the house during the day, used a bucket in the woods for their elimination needs, were locked in the attic at night, and were forced to urinate and defecate in bottles and bags.

[59] At the time of removal all of the Children were emaciated except for G.H., who begged for snacks and dug through the trash while he was enrolled in school. When teachers at school and DCS began recognizing these issues, the Harmons

took the Children out of school and decided that homeschooling was a better option for their own sake. However, the record reflects that the Children were homeschooled for no more than one year out of the three years that they were taken out of public school. When the Children returned to public school, they were all unable to pass their grade appropriate placement tests.

[60] Furthermore, Harmon beat the Children with whips, paddles, and switches from trees in his yard. He claimed that this was the only punishment that would work because the Children did not listen to him. At the time the Children were removed, all four had red marks, bruises, and scars from being punished by Harmon. Even worse, Harmon participated in sexual acts with S.H. and C.A.H., and he also forced G.H. to participate in sexual acts with his sisters as Harmon watched. The Children looked to Harmon for guidance and love, but were instead subjected to gross mistreatment and abuse that no child should ever have to endure. The nature of Harmon's offenses alone justify the trial court's sentencing decision. *See Williams v. State*, 997 N.E.2d 1154, 1166 (Ind. Ct. App. 2013).

[61] Although Harmon has no prior criminal history, Harmon's treatment of the Children is evidence of his deplorable character. Thus, Harmon has not persuaded us that the trial court's imposition of an aggregate eighty-year sentence, with thirteen years suspended is inappropriate in light of the nature of the offense and the character of the offender.

## Conclusion

The State presented sufficient evidence to support Harmon's Count III, Class C felony and Count VIII, Class C felony battery convictions. Further, the trial court did not abuse its discretion or violate Harmon's right to present a defense when it excluded evidence that another person might have perpetrated additional sexual misconduct with one of the minor victims. Harmon's neglect of a dependent and battery convictions also did not violate Indiana's prohibition against double jeopardy and we affirm Harmon's eighty-year aggregate sentence.

Affirmed.

Vaidik, C.J., and Barnes, J., concur.