IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 21, 2016

**JOE TURNER v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Knox County**
**No. 98504     Bob R. McGee, Judge**

_____

**No. E2015-00849-CCA-R3-PC – Filed March 8, 2017**

_____

The Petitioner, Joe Turner, filed a petition in the Knox County Criminal Court seeking post-conviction relief from his convictions of two counts of aggravated rape, one count of especially aggravated kidnapping, one count of aggravated assault, and the accompanying effective sentence of one hundred years in the Tennessee Department of Correction. The Petitioner alleged that his appellate counsel was ineffective by failing to appeal the trial court's refusal to admit potentially exculpatory DNA evidence. After a hearing, the post-conviction court denied relief. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Joe Turner.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Charme Allen, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, this court summarized the proof adduced at trial as follows:

[T]he victim, A.T., testified that at the time of the offenses she was addicted to drugs and alcohol but that she had been "sober" for more than a year. The victim said that she met the [Petitioner] on Keith Avenue one to one and one-half months prior to the instant offenses. She and the [Petitioner] started a relationship, and they occasionally used crack cocaine and alcohol.

In August 2006, the victim was hired to clean rooms at the Best Value Inn in exchange for room and board. The [Petitioner] stayed with her. He promised to look for employment; however, after job searching, he often came back to the room drunk or with crack cocaine.

The victim testified that at times the [Petitioner] was violent. He took her belongings and threatened to burn them. He would also "strip [her]" so that she was unable to leave. He frequently grabbed her arms and physically restrained her. She said she did not want to be with the [Petitioner], but she was afraid of him.

The victim worked at the motel for one week before her job was terminated on August 16, 2006. The night before she lost her job, the [Petitioner] kept the victim awake until 3:00 a.m. "ranting and raving," making it difficult for her to work the next day. The victim said that on August 16, the [Petitioner] left to look for a job, and she began cleaning rooms. Her boss called her downstairs and told her he had to "let her go." The victim asked to be given a reason for her dismissal, and her boss responded that the [Petitioner] had been harassing the guests. The victim asked if she could continue to stay and work at the motel if she evicted the [Petitioner], but her boss told her that they both needed to leave. The victim left the [Petitioner's] belongings at the motel because she was unable to carry them. She told the motel clerk that the [Petitioner] would return later for his belongings.

At 5:00 or 5:30 p.m., after arranging to stay with a woman who lived on Keith Avenue, the victim went to a nearby convenience store. While she was there, the [Petitioner] confronted her. He was angry and cursing

because she had left his belongings at the motel. She told him that the relationship was not working and that his behavior had cost her a job and a place to stay. The victim left the store and went to the house where she was staying.

At 10:00 or 11:00 p.m., the victim returned to the store and bought a quart of beer. When she walked out of the store, the [Petitioner] grabbed the "neck area" of her shirt with one hand. In his other hand, he had an open Buck knife. The [Petitioner] repeatedly called the victim a "bitch." He held the knife to her throat, threatened to kill her, and dragged her to a dirt pile behind the store. The [Petitioner] told her that "no one else was going to have [her]" and threatened to "rape [her] dead body." Hoping to get the [Petitioner] to stop, the victim told him that God was watching them. The [Petitioner] responded by hitting both sides of her head and pushing her onto the dirt pile. The victim said the [Petitioner] was angrier than she had ever seen him.

The [Petitioner] ordered the victim to remove her clothes, and she reluctantly complied. She pled with the [Petitioner] to let her go. He used profanity, strangled her, and kept the knife near her face and neck. The victim briefly lost consciousness while the [Petitioner] strangled her. After the victim's clothes were removed, the [Petitioner] penetrated her vagina with his penis then ejaculated on her face. The [Petitioner] laughed, kicked dirt on her, and ordered her to get dressed.

The [Petitioner] then forced the victim to go to an abandoned house which was dark and smelled of urine. The [Petitioner] pushed the knife into her neck and ordered the victim to lie on a blue couch that was in the house. When she complied, he penetrated her again.

Afterward, the [Petitioner] appeared to be asleep. When the victim saw that it was getting light outside, she squirmed out from under the [Petitioner] and stood. She told him she would not tell police about the rapes if he allowed her to leave. The [Petitioner] allowed her to leave, but he followed her out of the house. She found a telephone and

called 911. The victim said she was disoriented, confused, weak, and had trouble breathing because of the strangulation.

An ambulance arrived and transported the victim to Baptist Hospital where she was examined. Later, she went to an out-of-county domestic violence shelter because she was afraid of the [Petitioner]. The victim stated that the ordeal lasted from 10:30 p.m. on August 16, 2006, until 7:30 a.m. on August 17, 2006.

The victim said that the [Petitioner] always carried a knife and that he liked to "flip" knives at odd times, such as when he watched television. Because of the strangulation, she had trouble swallowing for a month. She said that she had bruises and scrapes and that she healed slowly. She also stated that "mentally those scars are a lot deeper." She acknowledged that she had previously had consensual sex with the [Petitioner] but maintained that she did not consent on the night of the offenses.

Ginger Evans testified that on August 17, 2006, she was called to Baptist Hospital Emergency Department to perform a sexual assault forensic examination on the victim. When Evans first saw the victim, she was curled in a "fetal position" on an examination table. She was crying and was clearly upset. The victim told Evans that she was scared, and she asked Evans to find her a safe place to stay.

The victim told Evans that she had been sexually assaulted and strangled by the [Petitioner]. Evans said that the victim complained of pain and that she had marks and scratches on her body. Evans stated that the victim had broken blood vessels in her eyes and significant bruises on her neck, ears, and chin[,] which were consistent with strangling. Evans found dirt in various places on the victim's body, including her genital area, which could have been consistent with the victim being thrown on a pile of dirt. Additionally, Evans collected swabs from the victim's face and genital area. When she examined the victim's genital area, she saw redness and excoriation, which she described as a tearing away of the top layers of skin where the victim's legs connected with her pubic bone.

Kimberly Bryant, a Tennessee Bureau of Investigation [(TBI)] forensic scientist, testified that the swab from the victim's face revealed the presence of limited spermatazoa. She said that the [Petitioner's] genetic material was present in the swab.

Knoxville Police Department Investigator Steve Sill testified that he was working in the Violent Crimes Unit around 7:30 a.m. on August 17, 2006, when he received a call to respond to Baptist Hospital to investigate a rape complaint. When he arrived at the hospital, the victim was "very emotional, scared, upset. Obviously in some type of a crisis." Investigator Sill said the victim had bruises on her face, neck, arms, and legs, which corroborated her story.

Later that day, Investigator Sill went to the convenience store where the offenses occurred. He noticed a depression on the dirt pile behind the store. He walked the neighborhood and found an abandoned blue house and couch, which matched the victim's descriptions.

State v. Joe Michael Turner, No. E2009-00069-CCA-R3-CD, 2010 WL 3706434, at *1-3 (Tenn. Crim. App. at Knoxville, Sept. 22, 2010) (footnote omitted).

A jury convicted the Petitioner of two counts of aggravated rape, one count of especially aggravated kidnapping, three counts of aggravated kidnapping, and one count of aggravated assault. Id. at *3. The trial court sentenced the Petitioner as a persistent offender to consecutive sentences of fifty years for the aggravated rape convictions. Id. The trial court ordered the Petitioner to serve a fifty-year sentence for the especially aggravated kidnapping conviction to be served concurrently with the sentence for the second aggravated rape conviction. Id. "Finally, the trial court sentenced the [Petitioner] as a career offender to thirty years for each aggravated kidnapping conviction and fifteen years for the aggravated assault conviction and ordered that those sentences be served concurrently with the other sentences, for a total effective sentence of one hundred years." Id.

On direct appeal, the Petitioner challenged the length of the individual sentences and the imposition of consecutive sentencing. Id. at *1. Upon review, this court concluded that the aggravated kidnapping convictions should be merged into the especially aggravated kidnapping conviction. Id. This court affirmed the judgments of the trial court in all other respects. Id.

Thereafter, the Petitioner filed a petition for post-conviction relief, alleging among other claims that his appellate counsel was ineffective by failing to challenge the trial court's exclusion of evidence that male DNA detected on a vaginal swab from the victim did not match the Petitioner's DNA.

At the post-conviction hearing, the Petitioner said that trial counsel represented him for approximately one year. Trial counsel occasionally spoke with the Petitioner, who was incarcerated in Knox County, by telephone and met with him only twice. The Petitioner said that trial counsel did not sufficiently investigate the case or discuss the case with him. The Petitioner received copies of discovery from the trial court, not from trial counsel.

The Petitioner said that on the day of trial, he saw a TBI report on DNA analysis on the desk in front of trial counsel. The Petitioner had never seen the report. The report stated that a swab taken from the victim's vagina as part of the rape kit revealed DNA from an unknown male contributor and did not match the Petitioner. Trial counsel did not introduce the report during trial and did not question any of the witnesses about the report. The Petitioner opined that the report would have made a difference in the jury's verdict and in the sentences he received.

The Petitioner testified that appellate counsel met him only once and did not discuss the appeal with him.[1] The Petitioner wrote appellate counsel letters about the issues he wanted raised on appeal and when he did not receive a response, wrote a letter complaining about appellate counsel to the Board of Professional Responsibility. The Petitioner said that appellate counsel did not send him a copy of the appellate briefs or this court's opinion on his direct appeal. The Petitioner said that after the brief was filed, appellate counsel explained that he did not raise an issue about the DNA evidence because trial counsel failed to preserve the issue in the trial court. The Petitioner said that trial counsel challenged the exclusion of DNA evidence at trial and in the motion for new trial.

On cross-examination, the Petitioner said that he did not realize that his attorneys were allowed to make tactical and strategic decisions about his case and that they were not required to comply with all of his requests.

Trial counsel testified that he had practiced law for twenty-one years; the first ten years he was a prosecutor, and the next eleven years were primarily in criminal defense. Regarding the exclusion of the DNA evidence, trial counsel said that the TBI report

---

[1] The parties agreed that appellate counsel was not available to testify at the post-conviction hearing because he had retired from the practice of law. The post-conviction court further stated that appellate counsel had moved to another state.

reflected that male DNA on the vaginal swab taken from the victim did not match the Petitioner. Trial counsel recalled that the trial court made a pretrial ruling that evidence that DNA from an unknown male was found on the vaginal swab was not admissible because it was not relevant. Trial counsel raised the trial court's exclusion of the DNA evidence on the vaginal swab in the motion for new trial.

Trial counsel recalled that the Petitioner attempted to have him "fired" on the morning of trial and that shortly after the trial was concluded, the trial court relieved him as counsel because counsel and the Petitioner's relationship had deteriorated.

On cross-examination, trial counsel said that he was prepared for trial. The defense was that the sex was consensual, and identity was not an issue. Trial counsel acknowledged that the Petitioner's DNA was found on the victim's face, which corroborated her testimony that the Petitioner ejaculated on her face. Additionally, the victim testified that the Petitioner raped her on a dirt pile behind a convenience store, which was corroborated by Detective Still's testimony that he saw an indentation in the dirt pile.

At the conclusion of the hearing, the post-conviction court recalled that the State's case against the Petitioner was "very strong," that the victim was a "convincing" and "impressive" witness, and that forensic evidence supported her testimony. The court stated:

> There wasn't much of anything anybody could do about the DNA. I ruled on it – as I recall, I think I kept out the parts that did not name the [Petitioner], under the theory of the Rape Shield Statute. And I would still stand on that.

> There was a time – there used to be a time when, before we had DNA, if there was some semen found in a victim, or on a victim, some questioning was permitted about recent sexual activity, perhaps with other people, because that would raise the question of the identity of the person who left that semen there. But that – that issue disappeared with . . . DNA evidence, so . . . . There is no need to bring in any other evidence of any other kind of sexual activity.

Regarding appellate counsel, the post-conviction court stated that

> The only specific issue that's been raised in that respect was that he didn't argue the DNA issue on appeal. But this Court's satisfied that . . . it would have done no good

to do so.  And his failure to do so was not prejudicial to the [Petitioner].

The post-conviction court found that the Petitioner had failed to prove that either his trial counsel or his appellate counsel was ineffective.  On appeal, the Petitioner challenges only the post-conviction court's ruling regarding the effectiveness of appellate counsel.

## II.  Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence.  See Tenn. Code Ann. § 40-30-110(f).  "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'"  State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).  Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact.  See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).  Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct.  See Fields, 40 S.W.3d at 458.  However, we will review the post-conviction court's conclusions of law purely de novo.  Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Moreover,

[b]ecause a petitioner must establish both prongs of the

- 8 -

test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). The same test is used to determine the effectiveness of trial counsel and appellate counsel. See Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

This court has previously observed:

"[F]ailure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense. Counsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion."

State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Moreover, "[a]ppellate counsel are not constitutionally required to raise every conceivable issue on appeal." Carpenter, 126 S.W.3d at 887. Generally, "appellate counsel's professional judgment with regard to which issues will best serve the [Petitioner] on appeal should be given considerable deference[, and this court] should not second-guess such decisions, and every effort must be made to eliminate the distorting effects of hindsight." Id.

Our supreme court has set forth the following "non-exhaustive list" of factors which "is useful in determining whether an attorney on direct appeal performed reasonably competently in a case in which counsel has failed to raise an issue":

1) Were the omitted issues "significant and obvious"?
2) Was there arguably contrary authority on the omitted issues?
3) Were the omitted issues clearly stronger than those presented?
4) Were the omitted issues objected to at trial?
5) Were the trial court's rulings subject to deference on appeal?
6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications

reasonable?

7) What was appellate counsel's level of experience and expertise?

8) Did the petitioner and appellate counsel meet and go over possible issues?

9) Is there evidence that counsel reviewed all the facts?

10) Were the omitted issues dealt with in other assignments of error?

11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Id. at 888. "A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful." Michael Fields v. State, No. E2015-01850-CCA-R3-PC, 2016 WL 5543259, at *8 (Tenn. Crim. App. at Knoxville, Sept. 29, 2016) (citing Smith v. Robbins, 528 U.S. 259, 285-86 (2000)), perm. to appeal denied, (Tenn., Jan. 19, 2017).

The Petitioner makes a general complaint that appellate counsel should have challenged the trial court's exclusion of evidence that the male DNA detected on the victim's vaginal swab did not match the Petitioner's DNA. The State maintains that appellate counsel's decision to omit the issue was based on "sound professional judgment" because the evidence was inadmissible under the "rape shield law." We agree with the State.

Our supreme court has explained that "[r]ape shield laws were adopted in response to anachronistic and sexist views that a woman who had sexual relations in the past was more likely to have consented to sexual relations with a specific criminal defendant." State v. Sheline, 955 S.W.2d 42, 44 (Tenn. 1997). The rape shield laws were designed to prevent "the trial of the rape victim based on her past sexual conduct." Id. Tennessee's rape shield rule, Tennessee Rule of Evidence 412, "limits the admissibility of evidence about the prior sexual behavior of a victim of a sexual offense[] and establishes procedures for determining when evidence is admissible." Id.; see also State v. Douglass Leon Lyle, No. E2012-00468-CCA-R3-CD, 2013 WL 1281857, at *12 (Tenn. Crim. App. at Knoxville, Mar. 28, 2013). "Tennessee Rule of Evidence 412 permits [an accused] to introduce specific instances of a victim's sexual behavior only if the prosecutor or victim presents evidence during the trial regarding the victim's sexual behavior." State v. Mustapha Boutchiche, No. E2007-00473-CCA-R3-CD, 2009 WL 102949, at *6 (Tenn. Crim. App. at Knoxville, Jan. 12, 2009). In determining whether the contested evidence is admissible, a court must balance "the evidence's probative value against the harm that disclosure will cause to the victim. This balance includes

consideration of the harmful effect the proof may have on the victim." Tenn. R. Evid. 412, Advisory Comm'n Cmts. Essentially, "Rule 412 is a rule of relevance and is written as a rule of exclusion." State v. Brown, 29 S.W.3d 427, 430 (Tenn. 2000). "As with other evidentiary rulings, the admissibility of the evidence [under Rule 412] rests in the discretion of the trial court." Sheline, 955 S.W.2d at 46.

In order for the evidence to be admissible under the rule, the accused generally must file no later than ten days prior to trial a written motion seeking to offer such evidence, and the "motion shall be accompanied by a written offer of proof, describing the specific evidence and the purpose for introducing it." Tenn. R. Evid. 412(d). Tennessee Rule of Evidence 412(c) provides in pertinent part that

> [e]vidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
>
> . . . .
>
> (4) If the sexual behavior was with persons other than the accused,
>
> (i) to rebut or explain scientific or medical evidence, or
>
> (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
>
> (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

On appeal, the Petitioner contends that one of his "defense theories was that the victim had a history of drug use and prostitution, and that the interaction of [the Petitioner] and the victim was of a commercial nature in which the presence of [the Petitioner's] DNA resulted from consensual activity by the victim." The Petitioner argues that the evidence of an unknown male's sperm on the victim's vaginal swab buttressed this claim and was therefore admissible under Rule 412. The State responds that allowing the Petitioner to adduce proof that the victim had sexual intercourse with another man "is precisely the type of proof that Rule 412 is designed to regulate." Therefore, the State contends that this issue would not have been successful on direct

appeal. We agree with the State.

We note that the record reveals the Petitioner never claimed at trial or at the post-conviction hearing that the sexual encounter with the victim was a "commercial transaction" or that the victim was a prostitute;[2] instead, he argued that he and the victim were involved in a relationship and that the sex was consensual. In his post-conviction petition and at the post-conviction hearing, the Petitioner merely raised a general challenge to the exclusion of the unknown male DNA evidence, contending that appellate counsel was ineffective because he was aware of the issue and should have raised it on appeal. A party is bound by the evidentiary theory argued to the post-conviction court and may not change or add theories on appeal. State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). Accordingly, we are not required to address issues raised for the first time on appeal. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

We agree with the post-conviction court that the Petitioner has failed to show that he would have been successful on appeal if appellate counsel had raised the issue of the trial court's exclusion of the DNA evidence. We note that although this specific issue has not been addressed in this jurisdiction, another jurisdiction has held that "evidence of unknown male DNA falls squarely into the general prohibition of Rule 412." Pribie v. State, 46 N.E.3d 1241, 1247 (Ind. Ct. App. 2015). In other words, the presence of an unknown male's sperm in a victim's vagina is evidence of sexual behavior as defined by Rule 412. See Tenn. R. Evid. 412(a). Evidence that the victim may have had sexual intercourse with another man did not negate the fact that the Petitioner's sperm was found on the victim's face, corroborating her statement that the Petitioner ejaculated on her face after vaginally penetrating her. Moreover, the presence of another man's semen on a swab of the victim's vagina had no bearing on whether the victim consented to sexual intercourse with the Petitioner. Robert Allen Edmonds v. Commonwealth, No. 2011-SC-000059-MR, 2012 WL 2362429, at *3 (Ky., June 21, 2012). We conclude that the evidence does not preponderate against the post-conviction court's finding that the Petitioner failed to prove that appellate counsel was ineffective.

## III. Conclusion

In sum, we conclude that the post-conviction court did not err by denying post-conviction relief.

_____
NORMA MCGEE OGLE, JUDGE

_____

[2] In his amended post-conviction petition, the Petitioner alleged that trial counsel should have cross-examined the victim about her addiction to crack cocaine and about her engaging in prostitution to support her addiction. However, no mention of this allegation was made at the post-conviction hearing.