

**FILED**

Dec 04 2015, 8:31 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| Heather M. Shumaker<br>Lebanon, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | George P. Sherman<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jordan Pribie,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | December 4, 2015<br><br>Court of Appeals Case No.<br>12A02-1412-CR-836<br><br>Appeal from the Clinton Circuit Court<br><br>The Honorable Bradley K. Mohler, Judge<br><br>Trial Court Cause No.<br>12C01-1312-FB-1195 |

**Baker, Judge.**

[1] Jordan Pribie appeals his conviction of Class B Felony Rape.[1] He argues that the trial court incorrectly found certain evidence to be barred by Indiana Evidence Rule 412, and that its exclusion violated his constitutional right to a fair trial. He also alleges two instances of juror misconduct and argues that these also violated his constitutional right to a fair trial. Finding that the trial court properly excluded the evidence and that no juror misconduct violated his rights, we affirm.

## Facts[2]

[2] On September 14, 2013, high school senior C.G. received a text message from Josh Curl inviting her to his house. C.G. had met Curl when she was a freshman and he a senior—the two had briefly dated but stopped due to her parents' disapproval. Telling her parents that she was going to a friend's bonfire, C.G. got into Curl's car, and the two went to his house around 11:30 p.m.

[3] At the house were defendant Jordan Pribie (Curl's housemate), Levi Asher, Ciara Harshman, and Ramee Collins. C.G. had met Pribie, but not the others, previously. Curl provided Captain Morgan and Bud Light, and the group played drinking games in the living room. Eventually, Curl became intoxicated

---

[1] Ind. Code § 35-42-4-1(a)(1).

[2] We held oral argument in this case at Indiana University's School of Public and Environmental Affairs, in Bloomington, IN. We thank counsel for their able and engaging oral advocacy. We also thank the School for its hospitality and continued interest in legal affairs.

to the point of illness. He threw up in the kitchen sink and stumbled off to his room to sleep.

[4] C.G. also became ill and threw up on herself. When she went to the bathroom to clean up, Pribie offered her a shirt but told her she could only have it if she had sex with him. Tr. 305. She declined, telling him that she would rather sleep in her own vomit. She grabbed the shirt, changed, and went to the couch to sleep.

[5] Despite throwing up again, C.G. was able to fall asleep, but Pribie woke her up a short time after. C.G. said "No" and tried to go back to sleep, but he kept pestering her. When she continued to ignore him, he grabbed her left wrist and pulled her upright. He then grabbed her other wrist, pulled her to her feet, and pushed her toward his bedroom. Pribie weighed around 265 pounds, C.G. around 140.

[6] C.G. noticed that her shirt had been removed, but did not know how. She told Pribie, "Stop. I wanna go to bed," to which he responded, "No. We're going to go and have sex." Tr. 314. He pushed her into his room and onto his bed, where he held her down with his right arm. As he undid her pants with his left hand, he told her, "Stop fighting. We're going to have sex if you like it or not. Stop fighting." *Id.* at 316. After a struggle, Pribie managed to force C.G.'s legs open, and he penetrated her. He continued for three minutes—telling her, "I know you like this," *id.* at 320—but he did not ejaculate. He then told her that she would not have to have sex with him if she would instead provide oral sex,

and tried to force his penis into her mouth. Just then, they heard a voice in the living room yell something like, "Stop that. Don't touch her." *Id.* at 322. Pribie stopped, put some shorts on, and left the room.

[7] After C.G. had lain down on the couch, but before Pribie took C.G. to his bedroom, Harshman and Asher had gone outside to the garage. When they returned to the living room, it was empty. As Harshman sat on the couch, she heard "whimpers" coming from the bedroom, but assumed it was Pribie and Collins having sex. *Id.* at 425. After the noises grew louder, Harshman realized it was not Collins's voice, but was C.G.'s instead. Harshman heard her say, "Get off of me. No. Stop. I don't want to." *Id.* at 426. She told Asher to listen. Asher heard C.G. say, "Stop it. No. Quit," followed by "I just wanna talk to Josh." *Id.* at 494. He then heard Pribie say, "The only way you're gonna see Josh [is] if you [] suck my d**k." *Id.* at 495. Asher was walking over toward the room when Pribie emerged.

[8] Harshman entered the bedroom and noticed that C.G. was naked under the covers. Harshman asked her if Pribie had hurt her—C.G. began crying and said, "Yes." *Id.* at 431. Harshman offered to call the police, but C.G. was on probation from a previous underage drinking case and did not want to get into trouble. C.G. obtained a t-shirt and sweatpants to wear, went to Curl's bedroom, and got into Curl's bed with him. Harshman and Asher spoke with Pribie and asked him whether he had raped C.G. After denying it for a few

minutes, Pribie finally said, "I admit it. I knew it was wrong at the time. I know I need help." *Id.* at 481.[3]

[9] The following day, a Sunday, Curl helped C.G. retrieve her clothes from Pribie's room. As he drove her back home, he asked her why her clothes were in there. She told him what had happened the night before. She did not, however, tell her parents, not wanting to get in trouble for lying to them about where she was. On Monday, Asher contacted law enforcement. C.G.'s father is a police officer; he learned of the report and came home early to ask her what happened. She decided to press charges. On Tuesday morning, her father took her to the hospital, where a nurse collected a rape kit. The rape kit did not disclose any DNA consistent with Pribie's, but did reveal sperm from an unknown male.

[10] On December 31, 2013, the State charged Pribie with class B felony rape. Pribie sought to introduce the evidence of the unknown male's DNA revealed by the rape kit, but the State objected. The court decided that this evidence was barred under Indiana Evidence Rule 412 as "evidence offered to prove that a victim or witness engaged in other sexual behavior." The court issued an Order in Limine excluding the use of this evidence at trial. In an offer of proof outside the presence of the jury, C.G. stated that she had consensual sex with Curl four

---

[3] Pribie claims this statement was sarcastic, appellant's br. at 6, but Harshman specifically testified that his tone "wasn't sarcastic." Tr. 480.

or five hours after the events in Pribie's bedroom. The jury did hear the evidence that a rape kit was done and that it did not reveal Pribie's DNA.

[11] Following an August 2014 jury trial, the jury found Pribie guilty of Class B Felony Rape, and the trial court sentenced him to ten years imprisonment, with two years suspended to probation. Pribie now appeals.

## Discussion and Decision

[12] Pribie has two major arguments regarding his conviction. He argues that the trial court should have admitted the portion of the rape kit disclosing unknown male DNA, and he argues that the trial court should have granted his Motion to Correct Error filed after the trial, wherein he alleged juror misconduct.

## I. Exclusion of Evidence

[13] Generally, admission of evidence is a matter of discretion for the trial court. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). Such decisions are reviewed for abuse of that discretion and will be reversed only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.*

[14] Pribie argues that the trial court improperly excluded the evidence of the unknown male DNA revealed by the rape kit. He has five arguments for why the evidence should be admitted: that (1) Evidence Rule 412 does not apply to this evidence; or, if it applies, (2) the evidence falls into the exception in 412(b)(1)(A); (3) the evidence falls into the exception in 412(b)(1)(C); (4) the

State opened the door to the evidence in its direct examination of C.G.; and (5) the State opened the door to the evidence in its direct examination of biologist Nicole Keeling. We will address each of these arguments in turn.

## A. Whether Rule 412 Applies

[15] We first note that the exact language of Rule 412 has recently changed. Previously, the Rule began, "In a prosecution for a sex crime, evidence of the past sexual conduct of a victim or witness may not be admitted," before listing several exceptions. *E.g., Davis v. State*, 749 N.E.2d 552, 554 (Ind. Ct. App. 2001). Effective January 1, 2014—after the alleged rape in this case but before the trial—the Rule was amended to generally prohibit "evidence offered to prove that a victim or witness engaged in other sexual behavior." Ind. Evidence Rule 412.

[16] Pribie argues that he was seeking to admit evidence of subsequent, rather than past, sexual conduct, and therefore that the evidence does not fall within the language of the previous version of the Rule. Although this argument is not fleshed out in the parties' briefs, they disagreed at oral argument over which version of Rule 412 should apply to Pribie's case, and Pribie broached the possibility that the application of the newer version could constitute a violation of the prohibition on ex post facto laws. We disagree, and find that the new version can constitutionally be applied in Pribie's case.

[17] The United States and Indiana Constitutions prohibit the passage and enforcement of ex post facto laws. U.S. Const. art. I, § 9, cl. 3; Ind. Const. art.

I, § 24. The classic statement of what constitutes an ex post facto law is as follows:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3. U.S. 386, 390 (1798).[4] Although the fourth category refers to rules of evidence, this only encompasses a change in the quantum of proof required for conviction, if specified by statute. *See Hopt v. People of the Territory of Utah*, 110 U.S. 574, 590 (1884) (holding that rules regarding what evidence is permitted at trial "relate to modes of procedure only, in which no one can be said to have a vested right, and which the state, upon grounds of public policy, may regulate at pleasure").

[18] Applying these principles, we have previously held that the application of the Rape Shield Law did not violate the prohibition against ex post facto laws, even where there was no such rule of evidence at the time the defendant committed

---

[4] The prohibition was drafted with the history of the British Parliament in mind: "By the enactment of such statutes, the most faithful subjects of that kingdom have been sacrificed; and in times of internal commotion and political persecution, the blood of innocent victims has been made to smoke on the altar, as an oblation to the malignant passions of men in power." *Strong v. State*, 1 Blackf. 193, 196 (Ind. 1822) (finding valid a change in the punishment for perjury from whipping to imprisonment).

his offense and the rule only became effective the following year. *Finney v. State*, 179 Ind. App. 316, 321, 385 N.E.2d 477, 480-81 (1979). We noted that the inquiry turned on whether the new rule of evidence altered a "substantial personal right," or "mere procedure." *Id.* at 321, 385 N.E.2d at 480. We found that "the rape shield statute affects the use of character evidence to impeach witnesses at trial and is therefore procedural in nature." *Id.* at 321, 385 N.E.2d at 480-81. Clearly, if the application of the entire rule, made effective after the offense but before trial, did not violate the prohibition against ex post facto laws, neither does the application of slightly altered language in the rule. Therefore, we find it appropriate to use the current version of Rule 412.[5]

[19] Turning to the instant case, the evidence of unknown male DNA falls squarely into the current language of Rule 412: it is "evidence offered to prove that a victim . . . engaged in other sexual behavior." While Pribie is correct that "penal statutes should be construed strictly against the State and ambiguities should be resolved in favor of the accused," *Merritt v. State*, 829 N.E.2d 472, 475 (Ind. 2005), even the strictest construction of the rule would encompass the evidence he seeks to admit.

---

[5] We also note that, while there is no Indiana case law ruling on whether our previous Rule 412 applies to subsequent acts, courts in other states have interpreted their analogous rules of evidence to prohibit such evidence. *See Parish v. State*, 163 S.W.3d 843, 850 (Ark. 2004) (interpreting the phrase, "prior sexual conduct," to encompass sexual conduct that occurred prior to trial, not prior to the alleged rape).

Since the evidence of unknown male DNA falls squarely into the general prohibition of Rule 412, we now turn to whether it falls into any of the exceptions.

## B. Source of Physical Evidence Exception

Indiana Evidence Rule 412(b)(1)(A) provides that a court may admit "evidence of specific instances of a victim's . . . sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." Pribie argues, "the rule contemplates the admissibility of DNA evidence and then affords parties the opportunity to explain the DNA results." Appellant's Br. at 13.

We disagree. The rule contemplates that *if* the State had presented the unknown male DNA to the jury, Pribie *then* would have been allowed to present evidence showing that the DNA came from someone else. The same is true if the State had presented evidence of injuries to C.G. or any other physical evidence of the rape; the exception ensures a defendant's ability to rebut any inference that he was connected to such evidence.

But the State did not present any such evidence in this case. It did not put before the jury any lacerations, or bruises, or any other physical evidence and claim that they were the result of Pribie's conduct. If it had done so, then Pribie would have the right, under this exception, to posit that C.G.'s encounter with Curl produced that evidence.

Instead, the State relied upon C.G.'s account, which was corroborated by Harshman and Asher. An exception that allows a defendant to rebut physical evidence presupposes the admission of that evidence; since the State did not rely on physical evidence to convict Pribie, the exception does not apply.

## C. Constitutional Rights Exception

Indiana Evidence Rule 412(b)(1)(C) provides that a court may admit "evidence whose exclusion would violate the defendant's constitutional rights." The trial court's exclusion of evidence must not prevent the defendant from conducting a full, adequate, and effective cross-examination. *Oatts v. State*, 899 N.E.2d 714, 722 (Ind. Ct. App. 2009). Admission of evidence to prove that a victim engaged in other sexual behavior "may . . . be required when the trial court restricts a defendant from giving his own account of the events at issue." *Williams v. State*, 681 N.E.2d 195, 201 (Ind. 1997).

Pribie cites to this language to argue that he has a Sixth Amendment right to "present[] his own account of that evening," but instead he was forced to "merely respond to the State's evidence." Appellant's Br. at 14.

We find Pribie's reliance on the language in *Williams*, regarding a defendant's right to give an account of the event, to be misplaced. Our Supreme Court cited that language from *Stephens v. Miller*, 13 F.3d 998, 1017 (7th Cir.) (Coffey, J., dissenting). The defendant in *Stephens* argued that an application of Rule 412 violated his Sixth Amendment rights where he was unable to repeat statements he alleged that he made to the victim during the alleged rape. *Id.* at 1000. He

wanted to tell the jury that he had made a rude comment regarding the victim's sexual proclivities while the two engaged in consensual sex, and that that comment led to the victim falsifying the rape claim. *Id.* Instead, the trial court instructed him to say only that something he had said made her angry. *Id.*

[28] And yet even in that case, as shown by the fact that the language came from a dissent, the Seventh Circuit held that "Stephens was not deprived of his constitutional right to testify." *Id.* at 1003. Indeed, our Supreme Court also rejected Stephens's argument that the application of Rule 412 to his circumstances violated his rights. *Stephens v. State*, 544 N.E.2d 137 (Ind. 1989). That case is a much closer call than the instant case, where Pribie had every right and opportunity to describe and cross-examine the incident that led to the rape charge, but was only prevented from presenting to the jury a sexual encounter the victim had with a third person, which took place hours later.

[29] In sum, because Pribie had every opportunity to describe and cross-examine the events that he was involved in, he was not "restrict[ed] . . . from giving his own account of the events at issue," *Williams*, 681 N.E.2d at 201, and therefore the evidence he seeks to admit does not fall into the exception described in 412(b)(1)(C). We now turn to whether the State opened the door to this evidence by its conduct at trial.

## D.  Did C.G.'s Testimony Open the Door

[30] In certain circumstances, a trial court may admit otherwise inadmissible evidence for the purpose of rebutting a party's testimony at trial. *See Barker v.*

*State*, 440 N.E.2d 664, 668 (Ind. 1982). Pribie points to a statement made by C.G. on direct examination, namely, that Curl did not "stir at all" after she got into bed with him. Tr. 330. Pribie argues that he should have been allowed to use the subsequent sexual conduct to impeach this statement, and that this would have helped his case since the State's case rested so heavily on C.G.'s credibility.

[31] This argument fails. The use of a prior inconsistent statement to impeach a witness's credibility requires that the statement actually be inconsistent with another statement. For example, the defendant in *Barker* first confessed to a burglary, then testified at trial that he did not commit the burglary. 440 N.E.2d at 666.

[32] The question that elicited C.G.'s response was, "At any of these times from the time you first went there after the rape happened to the second time you went back in there, did Josh ever stir at all . . . when you got back into bed with him?" Tr. 330. C.G. responded: "Not that I'm aware of." *Id.* C.G. later explained, during the offer of proof, that the consensual sex took place several hours after she got back into bed with Curl. Both statements are entirely consistent with each other—C.G. testified that Curl did not stir "when [she] got back into bed with him," but that several hours later they had consensual sex. *Id.*

[33] Since there was no inconsistency on this issue, there was nothing to impeach.

# E.  Did Biologist Keeling's Testimony Open the Door

[34]  At trial, the State had the following exchange with Nicole Keeling:

> Q:    Assume the evidence and testimony that's come prar—
> prior to you testifying today is that this happened early
> morning hours; the rape happened early morning hours of
> Sunday; that there was no ejaculation by the defendant;
> and the samples that you tested were collected noon hour
> on Tuesday.  Are you surprised that you did not find the
> defendant's DNA?
>
> A:    No.

Tr. 621.  Pribie argues that the State was being purposefully misleading—this exchange led the jury to believe that no DNA evidence would survive the two and a half day interval between the incident and the examination.  Pribie argues that this is obviously false, given that another man's DNA survived from consensual intercourse taking place only a few hours after the incident.  Pribie contends that the admission of the unknown male DNA would have clarified for the jury that the mere passage of time would not have been sufficient to explain the absence of Pribie's DNA.

[35]  While we agree with Pribie that the State's question has the potential to confuse the jury, this argument ultimately fails.  The State was careful to qualify the question; the question explicitly limited the inquiry to the situation in which "there was no ejaculation."  C.G. had already testified that Pribie had not ejaculated.  Tr. 320.  Whether male DNA would survive two and a half days in the situation in which the male *did* ejaculate is a different inquiry.

While a jury member could have misunderstood the question and answer to mean that the mere passage of time explained the lack of Pribie's DNA, we do not conduct an inquiry into the minds of jury members and we must assume that jury members understand the plain meaning of questions and answers heard at trial. Therefore, we cannot say the trial abused its discretion to continue to keep the evidence of unknown male DNA out, and we cannot reverse on this issue.

## F. Rule 403 Generally

Finally, we note that even in the absence of Rule 412, the trial court would not have abused its discretion to keep the evidence of unknown male DNA out of evidence. As our Supreme Court has explained, "even when evidence does not fall within one of Rule 412's exceptions and is admissible, it is still subject to Evidence Rules 401 and 403." *Williams*, 681 N.E.2d at 200-01. In that case, the Court affirmed a trial court's exclusion of "evidence [that] would shift the jury's attention away from the defendant's actions to the past acts of the victim." *Id.*

We find that to be the case here. Even if C.G.'s activities with Curl had relevance to the claims against Pribie—perhaps that C.G.'s relationship with Curl increased marginally her willingness to misrepresent the events of that night—the evidence of that activity is "substantially outweighed by the danger of unfair prejudice." Ind. Evidence Rule 403. The admission of that evidence creates the risk of impermissibly tarnishing C.G.'s character and of shifting the

jury's attention from the events taking place in Pribie's room, which are at issue in this case, to the events taking place in Curl's room, which are not.

[39] Furthermore, the jury did hear that C.G. and Curl had previously dated; that she was at his house at his invitation; that he picked her up and drove her there; that she slept in his bed; and that she was "under the covers with Josh." Tr. 330. All of these facts decrease the probative value of the evidence Pribie seeks to admit: he had enough facts to argue that C.G. was biased.

[40] In sum, whatever probative value the evidence of C.G.'s subsequent sexual activity holds is substantially outweighed by the danger of unfair prejudice; that evidence could have been excluded on Rule 403 grounds alone, rendering any error in the trial court's Rule 412 analysis harmless.

## II. Juror Misconduct

[41] Pribie alleges that there were two instances of juror misconduct, both of which should have compelled the trial court to grant his motion to correct error. We review a trial court's denial of a motion to correct error for an abuse of discretion. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it or when it has misinterpreted the law. *James v. State*, 872 N.E.2d 669, 671 (Ind. Ct. App. 2007). We do not reweigh evidence nor reassess the credibility of witnesses. *Petersen v. Burton*, 871 N.E.2d 1025, 1028 (Ind. Ct. App. 2007).

# A. Juror/Bailiff Conversation

[42] The first alleged instance of juror misconduct involves an ex parte conversation between a juror and the bailiff. During a break in the trial, a juror told the bailiff that she "knew people on both sides" of the case. Tr. 729. The bailiff responded that they lived in a small, close community and asked whether the people the juror recognized were close friends. The juror said no. The bailiff then asked whether it would prejudice her decision. The juror said no. The bailiff then dropped the issue, but never reported the conversation to the court or the defense during trial.

[43] Indiana Jury Rule 24 provides the following: "If the court receives information that a juror has personal knowledge about the case, the court shall examine the juror under oath in the presence of the parties and outside the presence of the other jurors concerning that knowledge."

[44] The parties do not dispute that the procedure prescribed in this rule was not followed, as the bailiff did not bring the fact to the judge's attention, nor was Pribie present when the bailiff conducted his investigation. When communication between a bailiff and a jury occurs outside of the defendant's presence, there is a presumption of harm to the defendant that the State must rebut to avoid reversal. *Azania v. State*, 730 N.E.2d 646, 654 (Ind. 2000). The State may, however, avoid reversal if no harm or prejudice resulted from the communication. *Farris v. State*, 732 N.E.2d 230, 234 (Ind. Ct. App. 2000).

[45] We find that, although the bailiff's actions were inappropriate, they constitute harmless error. Pribie argues that by "conduct[ing] his own examination and dismiss[ing] Juror Deford's concerns . . . the Bailiff tainted Juror Deford by communicating—explicitly or implicitly—that whatever knowledge she had or whatever relationship she had was not important." Appellant's Br. 23. We fail to see the "taint": if the proper procedure had been followed, the trial judge, rather than the bailiff, would have asked substantially the same questions as the bailiff. Once the juror told the judge that she was not close to any of the witnesses and that she would not let her knowledge affect her decision, the trial court would have acted within its discretion to keep the juror. As in *Farris*, "[t]he bailiff's response . . . was similar to instructions the court would have provided. The bailiff did not talk about the facts of the case, further instruct the jury, or discuss substantive legal matters with the jury." 732 N.E.2d at 235.

[46] We cannot see how the correct procedure would have yielded a different result for Pribie. Therefore, while the bailiff's actions were clearly in error, they were also harmless. The trial court did not abuse its discretion to deny Pribie's motion to correct error on these grounds.[6]

---

[6] We would like to take this opportunity to repeat what we said in *Farris*, 732 N.E.2d at 235: "While we find that the error in this case was harmless, we do not mean to say that communication between a bailiff and the jury is appropriate. On the contrary, it is important that trial courts instruct bailiffs to refrain from communicating about the case with jurors. Further, when jurors ask questions of the bailiff, the bailiff's response should be limited to an indication that he will forward the question to the judge. We recognize that bailiffs have numerous opportunities to influence juries. Therefore, courts must be ever cautious to minimize those opportunities consistent with practicality. It is important that juries reach their decisions fairly and impartially. Likewise, it is of equal importance to maintain the integrity of the judicial system and avoid the

# B. Juror Deliberations

[47] The second alleged instance of juror misconduct regards a conversation held between jury members. The jury foreman, Juror Ploughe, was a corrections officer. Juror Reed said that she did not want to convict Pribie if that entailed his being listed on a sex offender registry. Knowing that Ploughe was a corrections officer, she asked him whether a guilty verdict would have such a result.

[48] Reed testified that Ploughe told her that Pribie would not end up on the registry because C.G. was over eighteen. Tr. 691. Another member of the jury, Juror Webster, confirmed that Reed "did not wanna find Mr. Pribie guilty if he was gonna have to register," *id.* at 711, but Webster could not remember Ploughe's answer. Ploughe confirmed that he was asked the question, but "at that time I said I had no knowledge [] if he would be or not." *Id.* at 714.

[49] Prejudicial extraneous information may be grounds for impeaching a verdict whether there is a substantial possibility that such extrinsic material prejudiced the verdict. *Palilonis v. State*, 970 N.E.2d 713, 724 (Ind. Ct. App. 2012). The trial court was faced with conflicting accounts, however, regarding whether any extraneous information reached the jury; Reed said that it had, Ploughe said that it had not. The trial court heard the testimony of both and deemed

---

appearance of partiality in the decision-making process. Consequently, while we find no prejudice here, we will continue to examine closely communication between bailiffs and juries."

Ploughe's more credible. Appellant's Amended App. p. 263. As our standard of review makes clear, we will not reweigh the credibility of these two conflicting accounts to displace that finding. The trial court's factual finding that the jury did not hear any extraneous information stands and, accordingly, the trial court did not abuse its discretion to deny Pribie's motion to correct errors on these grounds.

[50] In sum, the trial court did not abuse its discretion when it excluded the evidence of unknown male DNA, nor did it abuse its discretion to deny the motion to correct errors where the bailiff's improper communication was harmless and the trial court found that the jury did not hear extraneous information.

[51] The judgment of the trial court is affirmed.

Najam, J., and Pyle, J., concur.