FILED

Jan 30 2020, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Kurt A. Young
Nashville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joseph K. Smith,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 30, 2020

Court of Appeals Case No.
19A-CR-1515

Appeal from the Marion Superior
Court

The Honorable Sheila A. Carlisle,
Judge

The Honorable Stanley Kroh,
Magistrate

Trial Court Cause No.
49G03-1808-F1-25558

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Joseph Smith (Smith), appeals following his conviction for rape, a Level 1 felony, Ind. Code § 35-42-4-1(a)(1); criminal confinement, a Level 5 felony, I.C. § 35-42-3-3(a); strangulation, a Level 6 felony, I.C. § 35-42-2-9(c); and domestic battery, a Class A misdemeanor, I.C. § 35-42-2-1.3(a)(1).

We affirm.

# ISSUES

Smith presents two issues on appeal, which we restate as the following:

(1) Whether the trial court abused its discretion when it excluded certain evidence, preventing Smith from exercising his right to present a full defense; and

(2) Whether the trial court abused its discretion when it denied Smith's motion for mistrial.

# FACTS AND PROCEDURAL HISTORY

Smith and J.R. were romantically involved from 2013 to 2017 and have two children together. In the summer of 2018, Smith contacted J.R. on social media, and the two began exchanging messages. J.R. was dating Aaron Perry (Perry) at the time. On July 31 and August 1, 2018, J.R. and Smith continued to message each other, and J.R. spent time with Smith at the homes of mutual friends.

[5]  On August 2, 2018, Smith texted J.R. asking for a ride from a home in the 600 block of North Linwood Avenue in Indianapolis, Indiana. J.R. had been wearing pants but assented to Smith's request that she wear a dress when she picked him up. When J.R. arrived at the home on Linwood, Smith approached from an alley and got into J.R.'s vehicle. Smith had a red book bag with him. Smith directed J.R. to pull around the back of the home into the alley. When J.R. asked why, Smith retrieved a knife-like letter opener from his book bag, showed it to J.R., and told her she "was either going to give him what he wanted, or he was going to take it from [her]." (Transcript Vol. III, p. 25). J.R. believed that Smith would stab her if she did not comply, so she pulled her vehicle into the alley, parked, and turned off the motor as Smith instructed.

[6]  Smith replaced the letter opener in his book bag and took out a small clamp, an eyeglasses lanyard, and Velcro handcuffs. Smith repeatedly told J.R. that, if she did not give him what he wanted, he would take it. J.R. told Smith that she did not want to have any sexual contact with him, which made Smith angry. Smith pulled down the top of J.R.'s dress, exposing her right breast. Smith placed the small clamp on J.R.'s nipple, removed the clamp, and placed his mouth on J.R.'s breast. Smith pushed aside J.R.'s underwear and placed his fingers within her vagina. After discovering there was not adequate room in the back seat for them, Smith exited the vehicle, opened the driver's side door, and placed the eyeglasses lanyard around J.R.'s neck. Smith tightened the lanyard to the extent that J.R. could not breathe and began to lose consciousness. While strangling J.R., Smith used his free hand to digitally penetrate J.R.'s

vagina. J.R. tried to push him away, and Smith eventually released the lanyard. Smith next had J.R. position herself on her hands and knees in the front seat and placed his mouth on her vagina. J.R. succeeded in pushing Smith away. J.R. cried and asked Smith why he was doing these things. Smith replied that J.R. "deserved everything [she] got." (Tr. Vol. III, p. 33). J.R. did not desire to engage in any of this physical contact with Smith and told him repeatedly to stop.

[7]     By this time J.R. was hyperventilating, and Smith began to cry as well. Smith got back into the passenger side seat and replaced all his belongings, apart from the lanyard, in his book bag. Because she was scared and did not know how else to get Smith out of her car, J.R. complied with Smith's request that she take him to purchase a beverage and leave him at a nearby plasma donation center. Before going into the donation center, Smith informed J.R. that he would tell Perry about their contact and took a photograph of J.R. in her car as proof. J.R. immediately deleted from her phone all the messages she and Smith had exchanged.

[8]     Around 2:00 p.m., J.R. messaged her friend Emily Nixon (Nixon), asking Nixon to call her and providing her new telephone number. Nixon immediately telephoned, and J.R. reported that she had met with Smith and had been hurt. J.R. seemed panicked, was emotional, and had labored breathing. J.R. was by herself when she spoke with Nixon. Nixon told J.R. to contact the police, but J.R. declined. After Nixon hung up with J.R., she telephoned Perry, thinking that he might arrive more quickly at J.R.'s home

than Nixon herself could. Nixon reached Perry at his place of business, and he left work immediately after she called. Nixon also left work and proceeded to J.R.'s home, calling 9-1-1 on the way.

[9] When Nixon arrived at J.R.'s home approximately fifteen minutes later, J.R. was still alone and upset. Shortly thereafter, Perry arrived. Perry remained at the door of J.R.'s home as he was told what had happened. Perry became upset and left before the police arrived. Nixon and J.R. both gave statements to the police. At 4:56 p.m. J.R. messaged Smith attempting to determine whether he was still at the plasma donation center. During the course of their messaging, J.R. told Smith she needed to speak with him "['c]ause what you did was fucked up," to which Smith replied, "What I'm about to do is even worse[.]" (Exh. 8, Exh. Vol. I, p. 16). The police remained at J.R.'s home until Nixon drove J.R. to the hospital around 6:00 p.m. for a forensic examination.

[10] Nurse Nakia Bowens (Nurse Bowens) performed a sexual assault examination on J.R. which revealed vein engorgement in the whites of J.R.'s eyes, redness on the tops of her ears and behind her left ear, and a linear red mark on the left side of her neck, all of which were consistent with strangulation by ligature. J.R. also had some redness in her vaginal area where the vestibule and labia majora met, which was consistent with vaginal digital penetration. The Post-Assault Sexual History portion of the medical records generated as a result of J.R.'s examination indicated as follows: "Patient states she engaged in the consensual sexual acts: Positive for Sexual Contact, anal sex, vaginal sex and

oral sex post-assault with ejaculation" with Perry. (Def.'s Hrg. Exh. A, Exh. Vol. I, p. 118).

[11] Shortly after he messaged with J.R. after the offenses, investigators found Smith, who was still at the plasma donation center. Smith gave investigators a statement. Smith acknowledged being with J.R. that afternoon but denied touching J.R. in any manner. Smith also reported that he had retrieved a pair of scissors for J.R. while he and J.R. were together that day in a house.

[12] On August 6, 2018, the State filed an Information, charging Smith with two Counts of rape as Level 1 felonies for the two instances of digital penetration while armed with a deadly weapon, one Count of criminal confinement elevated to a Level 3 felony for Smith's use of a deadly weapon, one Count of criminal confinement as a Level 5 felony for confining J.R. in her vehicle, strangulation, battery resulting in bodily injury, domestic battery, possession of marijuana, and possession of paraphernalia.[1] On May 2, 2019, Smith filed a motion seeking a preliminary ruling on the admissibility of the Post-Assault Sexual History portion of J.R.'s medical records. Smith argued that this evidence was admissible under Indiana Evidence Rule 412 to show that J.R.'s injuries were caused by someone else and that its admission was necessary for his constitutionally-protected right to present a defense.

---

[1] The trial court granted the State's pre-trial motion to dismiss the possession of marijuana and paraphernalia charges.

[13]     On May 21, 2019, the trial court held a hearing on Smith's motion.  Prior to the commencement of the hearing, the State represented to the trial court that, because it could not be determined when J.R.'s vaginal injury occurred, it did not intend to admit evidence of that injury or J.R.'s medical records at trial.  Smith argued that, if the State presented any evidence of injury to J.R., the Post-Assault Sexual History evidence was relevant and admissible.  Nixon testified about the timeline of her contact with J.R. and Perry on August 2, 2018.  Nixon specified that J.R. and Perry were never alone when Perry was briefly at J.R.'s home that day, she was with J.R. the entire time apart from when they gave their statements to the police, and Perry never returned to the home.  J.R. recounted her version of events.  J.R. denied that she had post-assault sexual contact with Perry, and she denied reporting that she had to Nurse Bowen.  J.R. testified that she had not had sex with Perry for four-to-five days before the offenses, they did not engage in any rough sex or strangulation, and that the injuries she had on August 2, 2018, were not the result of any sexual contact she had with Perry.

[14]     Nurse Bowens testified at the hearing that it was impossible to determine when a particular vaginal injury had occurred.  Nurse Bowens doubted the accuracy of J.R.'s Post-Assault Sexual History as it appeared in the printout of J.R.'s medical records.  Nurse Bowen explained that, at the time of J.R.'s examination, the hospital had recently converted to electronic charting.  After the switch, it was discovered that, at times, printouts of medical records did not match the data that had been input on the electronic chart.  One problem that

had been discovered was that sections of data were not printed. It had also been discovered that data sometimes appeared in the wrong location in the printout. As to J.R.'s medical records, a Pre-Assault Sexual History section should have appeared in J.R.'s medical records, but it did not. At the very least, the medical records should have shown 'none' under a Pre-Assault Sexual History. According to Nurse Bowen, it was very possible that the information appearing in J.R.'s Post-Assault Sexual History in her medical records was her reported Pre-Assault Sexual History. However, Nurse Bowen had no independent recollection of J.R.'s examination, and she did not know what J.R. had actually reported.

[15] The trial court found that, although the medical records were an exception to the hearsay rule, in light of Nurse Bowen's testimony, it could not deem the records at issue to be reliable. The trial court also found that, given the timelines provided by J.R. and Nixon, there was no opportunity for any post-assault sexual activity between J.R. and Perry. The trial court denied Smith's motion, finding the evidence to be inadmissible under Indiana Evidence Rules 412 and 403.

[16] On May 30, 2019, the trial court convened Smith's two-day jury trial. Smith moved the trial court for an order *in limine* prohibiting the State from admitting J.R.'s medical records or evidence that J.R. had previously procured a protective order against him. The prosecutor declared her intention not to seek admission of the medical records and stated that she did not intend to bring up

the subject of the protective order. The trial court granted Smith's motion *in limine*.

[17] Nixon testified and was cross-examined about the fact that J.R. did not say Smith had raped her when she initially spoke with Nixon on the telephone and J.R. did not wish her to contact the police or Perry. J.R. testified about the offenses. As the prosecutor questioned J.R. about why she had changed into a dress that day before meeting Smith, J.R. responded:

> Because in the messages that we were sending back and forth, that's one thing that he told me I had to do was put a dress on to come see him or he was going to let my boyfriend know that me and him had been in communication, which was against the protective order that I had filed against him.

(Tr. Vol. III, p. 28). Smith immediately moved for a mistrial because J.R. had violated the order *in limine* prohibiting the State from mentioning the protective order. The trial court denied Smith's mistrial motion, finding that J.R.'s reference to the protective order was not precipitated intentionally by the State and that the single brief reference did not place Smith in a position of grave peril. The trial court offered Smith the option to strike J.R.'s testimony or to have a curative instruction given to the jury to ignore J.R.'s testimony. Smith declined those options because he felt that, since the instant offenses were crimes of violence, he could no longer receive a fair trial. The prosecutor represented to the trial court that she had instructed J.R. not to mention the protective order, and the trial court requested that J.R. be re-instructed. No other evidence of the protective order was admitted at trial. J.R. testified that

after the offenses, she had injuries to her neck which were photographed at the hospital.

[18] Smith's counsel cross-examined J.R. about the fact that Perry was her boyfriend at the time, J.R. did not inform Perry that she had been in contact with Smith, J.R. was worried about Perry finding out about her contact with Smith, and J.R. believed that Perry would discontinue their relationship if he found out about her contact with Smith. J.R. also testified on cross-examination that, at the plasma donation center, Smith threatened to tell Perry about his contact with J.R., she did not want Smith to send the photograph he took of her to Perry, and that she had deleted the messages between her and Smith. In response to Smith's questions, J.R. confirmed that she had told Nixon not to call Perry or the police, that Perry was indeed upset after he came to J.R.'s home on the day of the offenses, and that, after talking to Perry, J.R. was concerned that Perry would leave her.

[19] Smith testified that J.R. had agreed to have sex with him on August 2, 2018, and that they met for that purpose. Smith denied removing the letter opener from his book bag but stated that he had a pair of scissors that he took out of his book bag while they were in the car in order to open a package of aspirin. Smith testified that he had removed J.R.'s right breast from her dress, placed the clamp and his mouth on J.R.'s nipple, touched the outside of her underwear, and gently touched her vagina with his hand while he touched his own genitals. According to Smith, the encounter was cut short when J.R. decided to remain faithful to Perry. The prosecutor questioned Smith about the

discrepancies between his initial statement to police that he had not touched J.R. that day and that he had retrieved the scissors for her in the house.

[20] During closing statements, Smith argued that J.R. reported the offenses because she was ashamed that she had sex with Smith and feared that Smith would inform Perry about it. Smith argued his theory that the contact that day was consensual based on evidence the two had been communicating, J.R. changed into a dress before meeting him, the claimed contact would have been difficult to achieve without consent, J.R. had opportunity to leave or fight back but did not, she drove Smith to purchase tea and then to the plasma donation center, tried to cover up what had happened by deleting her messages with Smith, and that she had told Nixon not to contact Perry or the police. Smith also pointed out to the jury that the State had not presented any evidence of injury to J.R.'s vagina from the alleged rape.

[21] The jury found Smith guilty on all charges. On June 11, 2019, the trial court vacated one of Smith's rape convictions, his Level 5 felony criminal confinement conviction, and his domestic battery conviction due to double jeopardy concerns. The trial court also entered judgment on the remaining criminal confinement conviction as a Level 5 felony because the rape offense entailed the use of the same deadly weapon to elevate it to a Level 1 felony. The trial court sentenced Smith to an aggregate sentence of thirty years, with eight years suspended to probation.

[22] Smith now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Exclusion of Evidence*

Smith contends that the trial court erred when it excluded J.R.'s Post-Assault Sexual History from the evidence. Our standard of review of a trial court's exclusion of evidence is well-settled: We review it only for an abuse of discretion. *Griffith v. State*, 31 N.E.3d 965, 969 (Ind. 2015). An abuse of discretion occurs when the trial court's ruling is clearly against the logic and effect of the facts and circumstances before it. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014).

## A. *Indiana Evidence Rule 412*

Smith sought to have J.R.'s Post-Assault Sexual History admitted pursuant to Indiana Evidence Rule 412, commonly referred to as the Rape Shield Rule. *Hall v. State*, 36 N.E.3d 459, 463 (Ind. 2015). Rule 412 prohibits the admission of any evidence offered to prove that a victim engaged in other sexual behavior or to prove a victim's sexual predisposition in a criminal proceeding involving alleged sexual misconduct. Ind. Evidence Rule 412(a)(1)-(2). The purpose of the Rule is to prevent the victim of a sexual assault from being placed on trial and to remove impediments to reporting sex crimes. *Conrad v. State*, 938 N.E.2d 852, 855 (Ind. Ct. App. 2010). The Rule embodies Indiana's Rape Shield Statute, codified at Indiana Code section 35-37-4-4, which recognizes that "inquiry into a victim's [other] sexual activity is sufficiently problematic that it should not be permitted to become the focus of the defense." *Williams v. State*, 681 N.E.2d 195, 200 (Ind. 1997).

[25] However, Rule 412's prohibition on evidence of the victim's other sexual behavior or predisposition is not absolute. The Rule provides exceptions in relevant part as follows:

> (1) Criminal Cases. The court may admit the following evidence in a criminal case:
>
> (A) evidence of specific instances of a victim's or witness's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence; [and]
>
> ****
>
> (C) evidence whose exclusion would violate the defendant's constitutional rights.

Evid. R. 412(b)(1)(A), (C). In addition, even when evidence falls within one of these exceptions and is admissible, it must still be relevant and admissible under Evidence Rules 401 and 403. *Williams*, 681 N.E.2d at 200-01. Smith argues that the evidence was admissible to foreclose "the possibility of him being the cause of J.R.'s vaginal injury," its exclusion deprived him of his constitutional right to present a full defense, and that any irregularities present in J.R.'s medical records went to its weight, not its admissibility. (Appellant's Br. p. 20). We address each of these arguments in turn.

### B. *Admission to Prove Vaginal Injury Caused by Someone Else*

[26] Smith argues that the evidence was admissible to prove that J.R.'s slight vaginal injury, as documented in her medical records, was caused by someone else.

This court examined a similar claim in the case of *Pribie v. State*, 46 N.E.3d 1241 (Ind. Ct. App. 2015), *trans. denied*. In *Pribie*, victim C.G. attended a house party at Pribie's home. *Id.* at 1244. C.G. became intoxicated, threw up, and eventually fell asleep. *Id.* Pribie woke up C.G. seeking sex, but she refused. *Id.* Pribie forced C.G. into his bedroom, penetrated her, but stopped when he heard a voice coming from the living room. *Id.* at 1244-45. Another friend found C.G. in Pribie's bed and offered to call the police. *Id.* at 1245. C.G. declined because she was on probation. *Id.* C.G. procured some clothing and got into the bed of Pribie's housemate, whom she had previously dated. *Id.* C.G. and the housemate had sex. *Id.* at 1246.

[27] C.G. decided to press charges against Pribie and underwent a forensic sexual assault examination at a hospital. *Id.* at 1245. Pribie's DNA was not found, but that of an unknown male was. *Id.* Pribie was charged with Class B felony rape and at trial sought to introduce the evidence from the sexual assault examination of the unknown male's DNA. *Id.* at 1245-46. The trial court found that the evidence was barred by Rule 412, but the jury was allowed to hear that the sexual assault examination had not revealed the presence of Pribie's DNA. *Id.* The State relied only on C.G.'s testimony to convict Pribie. *Id.* at 1248. It did not introduce any evidence of injury, DNA, or other physical evidence that it claimed belonged to or was caused by Pribie. *Id.*

[28] On appeal, Pribie argued that the DNA evidence was admissible to show someone other than he was the source of the male DNA. *Id.* In affirming the trial court's evidentiary ruling, this court disagreed, holding that

> [t]he rule contemplates that *if* the State had presented the unknown male DNA to the jury, Pribie *then* would have been allowed to present evidence showing that the DNA came from someone else. The same is true if the State had presented evidence of injuries to C.G. to any other physical evidence of the rape; the exception ensures a defendant's ability to rebut any inference that he was connected to such evidence.

*Id*. (emphasis in original). The court found that the exception allowing a defendant to rebut physical evidence presupposes the admission of that evidence and that the fact that the State did not rely on physical evidence to convict Pribie meant that the exception did not apply. *Id*.

[29] The same is true here. Smith urges that the J.R.'s Post-Assault Sexual History was relevant to prove that someone other than he caused the injury to J.R.'s vagina.[2] However, the State did not introduce evidence of the injury to J.R.'s vagina at trial, and, therefore, there was nothing for Smith to rebut with the Post-Assault Sexual History evidence. Thus, the exception did not apply. *Id*.

### C. *Constitutional Right to a Defense*

[30] Smith also argues that the evidence was admissible under the Rule's exception that provides for the admission of "evidence whose exclusion would violate the defendant's constitutional rights." Evid. Rule 412(b)(1)(C). He further

---

[2] Smith does not argue on appeal that the evidence was relevant to show that someone else caused the injuries to J.R.'s head and neck, evidence of which was used by the State to convict him. Regardless, we note that there was no evidence presented at the Rule 412 hearing or at trial linking the sexual acts listed in J.R.'s Post-Assault Sexual History with injuries to the neck and head.

contends that the State's failure to present evidence of J.R.'s vaginal injury "concealed significant evidence from the jury" and infringed upon his constitutionally-protected right to present a full defense. (Appellant's Br. p. 14).

[31] Whether it is rooted directly in the Due Process Clause of the Fourteenth Amendment or the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The admission of evidence showing that a victim had engaged in other sexual behavior "may . . . be required when the trial court restricts a defendant from giving his own account of the events at issue." *Williams*, 681 N.E.2d at 201. However, although the right to present a defense is fundamental and of the utmost importance, it is not absolute. *Marley v. State*, 747 N.E.2d 1123, 1132 (Ind. 2001). "'[T]he accused, as is required by the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Id.* (*quoting Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

[32] Here, Smith's theory at trial was that J.R. fabricated her rape claim because she was ashamed she had consensual sex with Smith and was afraid that Perry would find out what she had done. Smith developed this theory through a full and extensive cross-examination of Nixon and J.R. about J.R.'s voluntary contact with Smith prior to the offenses, her acquiescence to changing into a dress before meeting him, her deletion of her text messages, her desire not to alert the authorities or Perry after the offenses, and her fear that Smith would

tell Perry and Perry would leave her. Smith also testified at trial and provided his version of events that were the basis of the charges against him. Smith was also allowed to argue to the jury that the State had not presented any evidence of injury to J.R.'s vagina. Therefore, Smith had every opportunity to develop his own account of the events at issue. Smith was simply prevented from presenting the jury with evidence of J.R.'s other sexual behavior which allegedly occurred after the offenses and had nothing to do with the events which formed the bases for the charges against him. Therefore, we conclude that the evidence does not fall within the exception carved out by Rule 412(b)(1)(C).

[33] Nevertheless, Smith argues that the evidence was probative of his defense theory because J.R. could have had sexual contact with Perry after the offenses in order to prevent him from leaving her. However, the trial court found that the evidence was inadmissible under Evidence Rule 403, which provides that even relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. We agree with the trial court. Even if the evidence was probative of Smith's defense, its probative value was greatly outweighed by the increased chance that J.R.'s sexuality would be put on trial and become the focus of the defense, which is precisely what Rule 412 is meant to prohibit. *See Conrad*, 938 N.E.2d at 855; *see also Williams*, 681 N.E.2d at 200 (affirming exclusion of evidence that would have shifted jury's attention away from the defendant's actions to those of the victim). Because Smith's constitutional right to present a

defense was still required to comport with the Rules of Evidence and the evidence was inadmissible under Rule 403, we conclude that his right to present a defense was not unfairly curtailed. *Marley*, 747 N.E.2d at 1132.

### D. *Irregularities in the Medical Records*

Smith does not address the trial court's ruling on the admissibility of the evidence under Rule 403, but he argues that the trial court erred when it determined that, in light of the Nurse Bowen's testimony about the mistakes found in the hospital's medical records after it changed to electronic charting, the medical record evidence was so unreliable as to be inadmissible. Smith contends that any irregularities in the medical records went to the weight they could be afforded by the jury, not to their admissibility.

We will not reverse a trial court's evidentiary ruling if it is sustainable on any ground. *Crawford v. State*, 770 N.E.2d 775, 780 (Ind. 2002). Assuming, without deciding, that Smith is correct, we affirm the trial court's exclusion of the evidence on the additional ground, which Smith does not challenge on appeal, that it was inadmissible under Rule 403. *See Pribie*, 46 N.E. at 1250 (concluding that the Rule 412 evidence at issue was excludable under Rule 403 alone). Finding no abuse of the trial court's discretion in excluding J.R.'s Post-Assault Sexual History, we affirm the trial court's evidentiary ruling.

### II. *Mistrial*

Smith next argues that the trial court abused its discretion when it denied his motion for mistrial after J.R. testified in violation of the order *in limine* that she

had previously obtained a protective order against him. "A mistrial is an extreme remedy invoked only when no other curative measure can rectify the situation." *Hollowell v. State*, 707 N.E.2d 1014, 1024 (Ind. Ct. App. 1999). We review a trial court's denial of a motion for mistrial only for an abuse of discretion, and its decision is afforded great deference on appeal because the trial court is in the best position to assess all of the circumstances and their impact on the jury. *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). A mistrial is appropriate only where the questioned conduct is so prejudicial and inflammatory that the defendant was placed in a position of grave peril to which he should not have been subjected. *Pittman v. State*, 885 N.E.2d 1246, 1255 (Ind. 2008). The gravity of the peril to the defendant is measured by the conduct's probable persuasive effect on the jury. *Id.*

### A. *Waiver*

As a threshold issue, we address the State's argument that Smith waived his claim when he declined the trial court's offer to strike or to give an admonishment to the jury to ignore J.R.'s reference to the protective order. Citing *Randolph v. State*, 755 N.E.2d 572, 575 (Ind. 2001), and *Boyd v. State*, 430 N.E.2d 1146, 1149 (Ind. 1982), the State argues that refusing a trial court's offer of an admonishment to the jury results in waiver of a mistrial claim. Our supreme court has more recently clarified, however, that waiver of a mistrial claim "occurs where there was neither a request for admonishment nor a motion for mistrial." *Isom v. State*, 31 N.E.3d 469, 482 (Ind. 2015). Where a defendant has moved for a mistrial, the claim is not waived. *See id.* (finding no

waiver where Isom moved for a mistrial and proceeding to the merits of Isom's mistrial claim).

[38] Immediately after J.R. referred to the protective order, Smith moved for a mistrial. Although Smith declined the trial court's offer to strike or admonish, following *Isom*, he did not waive his mistrial claim. *Id.* Therefore, we shall address the merits of Smith's claim. *Id.*

## B. *Grave Peril*

[39] Smith argues that he was placed in a position of grave peril by J.R.'s reference to the protective order. Smith contends that this was essentially a credibility case and the reference painted him as "either a violent person or a stalker." (Appellant's Br. p. 25). He also argues that J.R.'s statement was made early in a relatively short trial, giving it great impact with the jury.

[40] Prior to the commencement of trial, the State had instructed J.R., who was a civilian witness, not to mention the protective order. There was no indication in the record that this reference was anything other than a mistake on J.R.'s part. There was no other evidence of the protective order introduced at trial, and the State did not mention it in its closing argument to the jury. These circumstances indicate that a mistrial was not warranted. *See Lucio v. State*, 907 N.E.2d 1008, 1011 (Ind. 2009) (upholding trial court's denial of a mistrial motion despite witness's reference to Lucio being jailed in the past, in part because the reference was a mistake by a civilian witness, no other witness testified to it, and the State did not argue it at the close of trial).

[41] In addition, J.R. gave a detailed account of the offenses, and her testimony regarding the strangulation, which Smith did not admit he had engaged in, was corroborated by physical evidence of the injuries J.R. sustained and the lanyard found in J.R.'s car. The State presented the messages between J.R. and Smith after the offenses which included an implicit admission on Smith's part that he had harmed her. The State also impeached Smith about the fact that he initially denied touching J.R. at all and about his shifting accounts regarding the scissors he had with him that day. Given that this was an isolated reference which took place during a two-day trial, the other evidence of Smith's guilt, some of which was corroborated by physical evidence, and the State's effective cross-examination of Smith, we conclude that J.R.'s reference to the protective order probably had very little persuasive effect on the jury. This is particularly true given that the reference was made in the context of J.R.'s testimony that she had engaged in voluntary contact with Smith several times in the days prior to August 2, 2018, which indicated to the jury that she was not afraid of Smith in spite of the protective order. Accordingly, we find no abuse of discretion on the part of the trial court in denying Smith's motion for mistrial. *See Mickens*, 742 N.E.2d at 929.

## CONCLUSION

[42] Based on the foregoing, we conclude that the trial court did not abuse its discretion when it excluded evidence of J.R.'s Post-Assault Sexual History or when it denied Smith's motion for mistrial.

[43] Affirmed.

Baker, J. and Brown, J. concur